1 | THOMAS R. BURKE (CA State Bar No. 141930)
thomasburke@dwt.com
2 | DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
3 | San Francisco, California 94111
Telephone:    (415) 276-6500
4 | Facsimile:    (415) 276-6599

5 | KATHERINE M. BOLGER (*pro hac vice* forthcoming)
katebolger@dwt.com
6 | JOHN M. BROWNING (*pro hac vice* forthcoming)
johnbrowning@dwt.com
7 | KATHLEEN E. FARLEY (*pro hac vice* forthcoming)
kathleenfarley@dwt.com
8 | DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
9 | New York, New York 10020
Telephone: (212) 489-8230
10 | Facsimile:   (212) 489-8340

11 | Attorneys for Non-Party Journalist
Ryan Mac

**FILED**

**SEP 13 2019**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

VERNON UNSWORTH,

Plaintiff,

vs.

ELON MUSK,

Defendant.

CV 19  80 224 MISC

Case No. _____

(C.D. Cal. No. 18-cv-08048-SVW-JC)

**NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA ISSUED FROM A CIVIL CASE PENDING BEFORE THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA AND SERVED ON NON-PARTY JOURNALIST RYAN MAC**

Hearing Date:  October 18, 2019
Hearing Time:  9:00 a.m.

MOTION TO QUASH SUBPOENA
Case No. _____

# TABLE OF CONTENTS

Page

I.   SUMMARY OF ARGUMENT ........................................................................................ 2

II.  FACTUAL STATEMENT .............................................................................................. 4

    A.   Ryan Mac ........................................................................................................... 4

    B.   The Rescue of a Boys Soccer Team Trapped in a Thai Cave System ........................ 4

    C.   The Dispute between Musk and Unsworth ............................................................. 5

    D.   Musk Reaches Out to BuzzFeed Reporter Ryan Mac ............................................... 7

    E.   BuzzFeed Publishes Musk's Latest Claim that Unsworth Is a "Child Rapist[]" ...................................................................................................................... 8

    F.   The Defamation Action ...................................................................................... 10

        1.   The Subpoenas *Duces Tecum* ..................................................................... 11

        2.   The Subpoenas *Ad Testificandum* .............................................................. 12

I.   THE CALIFORNIA SHIELD LAW ABSOLUTELY PROHIBITS ENFORCEMENT OF THE DEPOSITION SUBPOENAS ................................................ 13

II.  THE DEPOSITION SUBPOENAS IMPOSE AN UNDUE BURDEN ON MAC ............. 18

ii

MOTION TO QUASH
Case No. _____

| 1 | **TABLE OF AUTHORITIES** |
|---|---|
| 2 | Page |

3    **Cases**

*Baez v. JetBlue Airways,*
    2012 WL 5471229 (E.D.N.Y. Nov. 9, 2012)..........................................................................20, 22

*Baker v. F&F Inv.*
    470 F. 2d 778, 782 (2d Cir. 1972)..............................................................................................15

*Baker v. Goldman Sachs & Co.,*
    669 F.3d 105 (2d Cir. 2012)................................................................................................15, 16

*Branzburg v. Hayes,*
    408 U.S. 665 (1975)....................................................................................................................22

*Bryan v. News Corp.,*
    2018 WL 720057 (Cal. Ct. App. Feb. 6, 2018)..........................................................................19

*Canatella v. Van De Kamp,*
    486 F.3d 1128 (9th Cir. 2007) ....................................................................................................19

*Chandler v. Berlin,*
    2019 WL 1471336 (D.D.C. Apr. 3, 2019) ..................................................................................19

*Cohen v. Cowles Media,*
    501 U.S. 663 (1991).......................................................................................................................9

*Curley v. Vick,*
    211 Cal. App. 2d 670 (1963)........................................................................................................19

*Dart Indus. Co. v. Westwood Chem. Co.,*
    649 F.2d 646 (9th Cir. 1980) .......................................................................................................21

*Delaney v. Super. Ct.,*
    50 Cal. 3d 785 (1990) ...........................................................................................................15, 16

*Giuffre v. Maxwell,*
    221 F. Supp. 3d 472 (S.D.N.Y. 2016)..........................................................................................16

*Gonzales v. Google, Inc.,*
    234 F.R.D. 674 (C.D. Cal. 2006)..................................................................................................18

*Hammarley v. Super. Ct.,*
    89 Cal. App. 3d 388 (1979)..........................................................................................................15

*Hurry v. Fin. Industry Regulatory Auth., Inc.,*
    2017 WL 3701955 (N.D. Cal. Ar. 7, 2017) .....................................................................16, 17, 20

iii

*L.A. Mem'l Coliseum Comm'n v. NFL,*
  89 F.R.D. 489 (C.D. Cal. 1981) ...............................................................................13, 15, 17, 22

*Mattel Inc. v. Walking Mt. Prods.,*
  353 F.3d 792 (9th Cir. 2003) .................................................................................................18

*McKinney v. Cty. of Santa Clara,*
  110 Cal. App. 3d 787 (1980)..................................................................................................19

*Miller v. Super. Ct.,*
  21 Cal. 4th 883 (1999) .....................................................................................................14, 17

*Mitchell v. Superior Court,*
  37 Cal. 3d 268 (Cal. 1984)..............................................................................................17, 19

*N.Y. Times Co. v. Super. Ct.,*
  51 Cal. 3d 453 (1990) .....................................................................................................14, 17

*O'Grady v. Super. Ct.,*
  139 Cal. App. 4th 1423 (2006) .......................................................................................14, 17

*Playboy Enters., Inc. v. Super. Ct.,*
  154 Cal. App. 3d 14 (1984)..........................................................................................14, 15, 16

*Schneider v. United Airlines, Inc.,*
  208 Cal. App. 3d 71 (1989).....................................................................................................19

*Shaklee Corp. v. Gunnell,*
  110 F.R.D. 190 (N.D. Cal. 1986)............................................................................................14

*Shoen v. Shoen,*
  48 F.3d 412 (9th Cir. 1995) .............................................................................................17, 22

*Shoen v. Shoen,*
  5 F.3d 1289 (9th Cir. 1993) ...................................................................................................22

*Star Editorial, Inc. v. United States Dist. Ct.,*
  7 F.3d 856 (9th Cir. 1993) .....................................................................................................14

*Stephan v. Baylor Med. Ctr. at Garland,*
  20 S.W.3d 880 (Tex. Ct. App. 2000) ......................................................................................19

*Ward v. News Grp. Newspapers,*
  1990 WL 256836 (C.D. Cal. Aug. 25, 1990).........................................................................17

**Statutes**

Cal. Evid. Code
  § 1070..............................................................................................................................1, 14, 15

iv

**Rules**

Fed. R. Civ. P.
1 .................................................................................................................................17
26(b)(1) ....................................................................................................1, 18
26(c)(1) ...............................................................................................................18
30(b)(6) ..............................................................................................................12
45(d)(3)(A)(iii) ...........................................................................................3, 13, 17
45(d)(3)(A)(iii)-(iv) ...........................................................................................18
45(d)(3)(A)(iv) ....................................................................................................1, 13

Federal Rule of Evidence 501 ...........................................................................................14

**Constitutional Provisions**

Cal. Const. Article I, § 2(b) ..................................................................................1, 13, 14, 15

**Other Authorities**

Restatement (Second) of Torts § 576 cmt. (d) (1977) ........................................................19

v

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 18, 2019, at 9:00 a.m., or as soon thereafter as counsel may be heard in the San Francisco Courthouse of the above-captioned Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, non-party journalist Ryan Mac ("Mac") will and hereby does move this Court to quash two subpoenas (the "Deposition Subpoenas") issued in an ongoing action before the United States District Court for the Central District of California and served on Mac by counsel for defendant Elon Musk ("Musk") and plaintiff Vernon Unsworth ("Unsworth"), respectively. The Deposition Subpoenas sought to compel Mac to appear for a deposition in San Francisco, California, at 9:00 a.m. on September 11, 2019.[1]

As set forth in more detail in the attached Memorandum of Points and Authorities, Musk's Subpoena should be quashed for two reasons. First, Musk cannot compel Mac to testify because California's reporters' shield law provides Mac with an absolute immunity against being forced to disclose unpublished information acquired in connection with newsgathering activities. *See* Cal. Const. art. I, § 2(b) and Cal. Evid. Code § 1070 (collectively, the "California Shield Law"). Second, the Subpoena imposes an undue burden on Mac because the testimony sought by Musk is not relevant to any party's claim or defense in this action. *See* Federal Rules of Civil Procedure 26(b)(1), 45(d)(3)(A)(iv).

This Motion is based on this Notice, the Memorandum of Points and Authorities, and the declarations of Ryan Mac and Katherine M. Bolger, all matters of which this Court may take judicial notice, including filings in *Unsworth v. Musk*, No. 2:18-cv-08048 (C.D. Cal.) (the "Defamation Action"), the files and records in this action, and on such other argument as may be heard by this Court.

Dated: September 13, 2019

DAVIS WRIGHT TREMAINE LLP

By: _____
     Thomas R. Burke

---

[1] Unsworth and Musk agreed to extend Mac's time to file his motion to quash the Deposition Subpoenas up to and including September 13, 2019.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    SUMMARY OF ARGUMENT

The Deposition Subpoenas represent an attempt to harass and scapegoat BuzzFeed reporter Ryan Mac for publishing a news article about comments made by billionaire Tesla CEO Elon Musk. For the reasons set forth below, they should be quashed.

Musk kick-started the series of events that led us to this point on July 15, 2018 when he published a tweet to his 22 million followers that branded Vernon Unsworth – an expert caver who was instrumental in rescuing a Thai boys' soccer team trapped in a flooded cave – "pedo guy."[2] This outburst was apparently triggered by a CNN interview Unsworth gave in which he used the phrase "PR stunt" to describe Musk's highly publicized (but ultimately futile) efforts to rescue the children in a mini-submarine custom built by his engineers.

After seeming to apologize for this remark, Musk then made similar allegations in an email to Mac, writing, among other things: "I suggest that you call people you know in Thailand, find out what's actually going on and stop defending child rapists, you fucking asshole." BuzzFeed subsequently published that statement, which partly forms the basis of libel claims that Unsworth has now brought against Musk.[3] In responding to Unsworth's claims, Musk does not deny that he sent the email or that he made the allegedly defamatory statements about Unsworth. To the contrary, from what Mac can glean from the public filings and conversations with the parties' attorneys, Musk instead has decided to deflect blame away from himself and onto Mac by claiming that he cannot be held liable for the statements BuzzFeed published because he wrote "off the record" on the email he sent to Mac. But Musk is mistaken: his email to Mac was on the record (and thus fair game for publication) because Mac never agreed to keep the information confidential. This is one of the most basic rules of engagement in journalism and, if Musk (a public figure who has freely engaged with journalists for years) regrets the consequences his decision to make

---

[2] "Pedo" is a well-recognized shorthand for "pedophile." *See* Declaration of Katherine M. Bolger dated September 13, 2019 ("Bolger Decl."), Ex. W ("Complaint" or "Compl.") ¶77.

[3] Notably, Unsworth did not sue BuzzFeed for its reporting, which reflects the newsworthiness and public interest inherent in its publication of Musk's statement in the context of his campaign to use his clout to destroy the reputation of one of his critics.

unguarded statements to a reporter, he only has himself to blame. Nevertheless, Musk now seeks to depose Mac in hopes of establishing that BuzzFeed was somehow at fault for publishing Musk's incendiary comments.

The Deposition Subpoenas must be quashed pursuant to Rule 45 because they call for information that is absolutely protected from compelled disclosure by the California Shield Law and a qualified First Amendment qualified privilege, which were designed to protect journalists from just this kind of litigation harassment. The testimony Musk and Unsworth seek from Mac about why BuzzFeed made the decision to publish Musk's emails – which boils down to Mac's subjective editorial judgments, never expressed to a third party – is precisely the kind of sensitive information about the journalistic process that the privilege was designed to protect. Simply put, this Court "must quash" the Deposition Subpoenas because they require "disclosure of privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii).

In addition to Rule 45's prohibition on seeking privileged information from Mac, the Deposition Subpoenas must be quashed because they impose an undue burden on Mac. First and foremost, Mac's testimony is irrelevant to the legal issues in this case. Musk apparently intends to argue that he should not be held liable for BuzzFeed's republication of his statements because it was not "reasonably foreseeable" that BuzzFeed would republish his email. But the testimony that the parties seek from Mac – which essentially boils down to asking Mac why he and BuzzFeed chose to publish Musk's statements – is not relevant to this issue. Rather, the issue of reasonable foreseeability boils down to *what was Musk thinking*? Mac's testimony about thoughts he never expressed to Musk can have no bearing on this analysis. The undue burden on Mac is increased by the fact that all the evidence that could possibly inform a decision on Musk's state of mind – including his correspondence with Mac and the BuzzFeed News Standards and Ethics Guide – is available to the parties. There is simply no need to depose Mac. And finally, the Deposition Subpoenas must be quashed because Musk has an obvious ulterior motive – which is to harass Mac by subjecting him to a punitive and irrelevant deposition.

In sum, Mac has no relevant, non-privileged testimony to offer. The Deposition Subpoenas should be quashed.

3

## II.   FACTUAL STATEMENT

### A.   Ryan Mac

Ryan Mac is a senior tech reporter for BuzzFeed News based in San Francisco.  Declaration of Ryan Mac dated September 12, 2019 ("Mac Decl.") ¶ 1.  Mac had previously written stories about Musk and contributed to an in-depth article entitled *Elon Musk Has Always Been at War With the Media* (the "Musk at War Article") published on June 21, 2018 (before the incidents at issue here), which reported multiple instances in which Musk became "extraordinarily vindictive" towards anyone who criticized him in the press, "no matter how small the outlet or tempered the critique." Mac Decl. Ex. A.

### B.   The Rescue of a Boys Soccer Team Trapped in a Thai Cave System

The successful rescue of twelve boys and their soccer coach from a cave in Thailand was one of the biggest news stories of 2018.  Compl. ¶ 3.  Between June and July 2018, news organizations from around the world provided a rapt global audience with round-the-clock updates on the boys' harrowing ordeal and the audacious efforts to save them.  *Id.* ¶¶ 62-63.

The story began when the boys (aged eleven to sixteen) and their soccer coach went missing in the Tham Luang cave complex on June 23, 2019.  *Id.* ¶¶ 23-25.  As floodwaters threatened to overwhelm the boys, a desperate search and rescue mission commenced.  *Id.*  British caver Vernon Unsworth was among the first members of the international rescue team on the scene.  *Id.* ¶¶ 31, 34.  Unsworth was near the cave site at the time the boys were reported missing and was consulted because he was an expert caver with extensive experience of the Tham Luang cave complex, which he had been exploring since 2012.  *Id.* ¶¶ 13, 26-30.  Unsworth recommended expert cave divers, shared his personal knowledge of the cave system and remained on-site for the duration of the rescue efforts to offer assistance.  *Id.* ¶¶ 32-41.

On July 2, 2018, rescue divers found the boys and their coach alive in a partially flooded underground chamber.  *Id.* ¶¶ 41, 44-45.  Having located the lost soccer team, the rescue team turned their attention to deciding how to extract the boys safely from the flooded cave system.  *Id.* ¶¶ 46-47.  One option was to extricate the boys using a team of eighteen rescue divers, some of

4

1  whom would swim the boys out while others provided support at specific checkpoints along the
2  way. *Id.* ¶ 47.

3         Musk inserted himself into the crisis when he tweeted an offer to assist the rescue efforts.
4  Bolger Decl. Ex. A. Multiple news organizations reported on Musk's offer to help and subsequent
5  tweets discussing various plans to aid the rescue. *Id.* Exs. B, C. On July 6, 2018, for instance,
6  BuzzFeed and other news outlets reported that engineers from two of Musk's companies – SpaceX
7  and the Boring Company – would travel to Thailand to assess the cave in person and attempt to aid
8  the rescue efforts. *Id.* Exs. D, E. And on July 8, 2018, news organizations published tweets from
9  Musk about the child-sized submarine his engineers were building out of rocket parts and testing in
10  a Los Angeles swimming pool. *Id.* Exs. F, G.

11         Meanwhile, experienced cave divers were actually rescuing the boys. Compl. ¶¶ 54-55. On
12  July 8, 2018, four boys were fitted with face masks, sedated and guided through the caves to safety.
13  Compl. Ex. A (Timeline). Rescue divers extracted four more boys on July 9 and the remaining five
14  members of the soccer team safely emerged from the caves on July 10. *Id.* As the last boys were
15  being extricated from the cave, Musk personally delivered his child-sized submarine to the site.
16  Compl. ¶ 64. Remarkably, all twelve boys and their coach were in good health after being trapped
17  underground for more than two weeks. *Id.* ¶ 69. Musk's mini-submarine played no part in their
18  rescue. Compl. ¶ 64, Ex. A.

19         **C.     The Dispute between Musk and Unsworth**

20         Public interest in the boys' rescue did not abate in the days after they left the cave and CNN
21  interviewed Unsworth on July 13, 2018. *Id.* ¶ 70. The interviewer asked Unsworth what he
22  thought of Musk's highly-publicized efforts to extract the children from the cave in a tiny
23  submarine. Unsworth responded that it was a "PR stunt" that "had absolutely no chance of
24  working." *Id.* ¶ 71. Unsworth added that Musk "had no conception of what the cave passage was
25  like" and "can stick his submarine where it hurts." *Id.*

26         Musk responded to Unsworth's criticism by calling him a pedophile on Twitter. *Id.* ¶ 73,
27  Ex. D. In a series of tweets published on July 15, 2018, Musk told his 22 million followers that he
28  "[n]ever saw this British expat guy who lives in Thailand" and that he was "sus[picious]." *Id.*

MOTION TO QUASH
Case No. _____

1    Musk asserted that the water level was very low – which apparently made the rescue easier and
2    precluded the use of a submarine – and "challenge[d] this dude to show [the] final rescue video."
3    *Id.* ¶ 75. Musk ended his tirade by tweeting:

4         You know what, don't bother showing the video. We will make one of the mini-
5         sub/pod going all the way to Cave 5 no problem. Sorry pedo guy, you really did
6         ask for it.

7    *Id.* ¶ 76. When another Twitter user – "@GossiTheDog" – criticized Musk for "calling the guy
8    who found the children a pedo," Musk replied, "Bet ya a signed dollar it's true." Compl. ¶ 79,
9    Ex. E.

10        Musk's "pedo guy" tweet instantly became a huge news story in its own right. *See, e.g.*,
11    Compl. Ex. J (BuzzFeed Article about Musk's "Baseless Pedophile Claims"). The global media
12    was already focused on the boys' dramatic rescue – and the role Musk had sought to play in it – but
13    his tweets tapped into another subject of immense public interest, which was the increasingly
14    erratic behavior of Musk, one of the most high-profile CEOs on the planet. *Id.* ("Tesla and Space X
15    CEO is making life difficult for himself on Twitter *again*") (emphasis added). Two days before the
16    boys went missing, for instance, BuzzFeed published the Musk at War Article, an in-depth article
17    about growing concerns that "Musk's paranoia and late-night Twitter rants reveal a billionaire
18    cracking under pressure." Mac Decl. Ex. A. Musk deleted his tweets about Unsworth on July 18,
19    2018, after shareholders in one of his companies had publicly condemned them. Compl. ¶ 80.

20        That very same day, Musk posted an apology on Twitter. Compl. Exs. F, G. The apology
21    contained a link to a blog post by a business analyst, defending Musk and suggesting that unfair
22    treatment by the media offered him some justification for calling Unsworth a pedophile. *Id.* Ex. F.
23    Musk wrote, "[a]s this well-written article suggests, my words were spoken in anger after
24    Mr. Unsworth said several untruths & suggested I engage in a sexual act with the mini-sub, which
25    had been built as an act of kindness & according to specifications from the dive team leader." *Id.*
26    In a separate tweet, Musk wrote: "[n]onetheless, his actions against me do not justify my actions
27    against him, and for that I apologize to Mr. Unsworth and to the companies I represent as leader.
28    The fault is mine and mine alone." *Id.* Ex. G.

6

1  On August 28, 2018, a Twitter user – "@yoda" – criticized Musk for failing to apply his

2  "dedication to facts and truth … to that time when you called someone a pedo." *Id.* Ex. I. Musk

3  responded, "[y]ou don't think it's strange he hasn't sued me?  He was offered free legal services."

4  *Id.*  In response, a lawyer representing Unsworth tweeted that Musk "should check his mail before

5  tweeting" and posted a photograph of a claim letter dated August 6, 2018, stating that Unsworth

6  was "in the process of preparing a civil complaint for libel."  Compl. ¶ 87, Ex. H.  Media

7  organizations (including BuzzFeed) then published articles about Musk's tweets together with the

8  retort from Unsworth's lawyer.  *Id.* ¶ 86, Ex. J.

9  **D.     Musk Reaches Out to BuzzFeed Reporter Ryan Mac**

10  On August 29, 2018, BuzzFeed published an article by Ryan Mac, entitled "The Cave

11  Rescuer Elon Musk Called a 'Pedo' Has Lawyered Up and Is Preparing a Libel Claim."  Mac Decl.

12  Ex. B (the "August 29 Article").  As the August 29 Article reported, Mac sent Musk emails to "ask

13  for comment regarding [the] legal threat made by Unsworth's lawyer … after the Tesla CEO

14  renewed his apparently evidenceless criticism of the rescuer in a Twitter argument the day before."

15  *Id.* Ex. C, p. 3.  Musk responded to Mac's requests for comment with an email from his personal

16  email address:

17  Off the record

18  I suggest that you call people you know in Thailand, find out what's

19  actually going on and stop defending child rapists, you fucking asshole.  He's an

20  old, single white guy from England who's been traveling to or living in Thailand

21  for 30 to 40 years, mostly Pattaya Beach, until moving to Chiang Rai for a child

22  bride who was about 12 years old at the time.  There's only one reason people go

23  to Pattaya Beach.  It isn't where you'd go for caves, but it is where you'd go for

24  something else.  Chiang Rai is renowned for child sex-trafficking.

25  He may claim to know how to cave dive, but he wasn't on the cave dive

26  rescue team and most of the actual dive team refused to hang out with him.  I

27  wonder why …

28

MOTION TO QUASH
Case No. _____

1  https://www.google.com/search?q=chiang+rai+child+trafficking&ie=UTF
2  -8&oe=UTF-8&hl=en-us&client=safari

3       As for this alleged threat of a lawsuit, which magically appeared when I
4       raised the issue (nothing was sent or raised beforehand), I fucking hope he sues
5       me.

6  *Id.*, p. 13-14 ("Musk Email #1").

7       A short time later, Musk sent Mac a second email in response to his requests for comment.
8  *Id.*, p. 7 ("Musk Email #2"). In Musk Email #2, which purported to be "on background," Musk
9  disputed Unsworth's claim that he "was asked to leave by the Thai govt [sic]" and attached letters
10 from the Thai Prime Minister personally thanking Musk for his help. *Id.*, p. 11, 14-15. The email
11 further stated that Musk "[n]ever saw Unsworth at any point" and "[w]as told that he was banned
12 from the site." *Id.*, p. 15. Musk also complained that it was "also total bs [sic] that the mini-sub
13 wouldn't fit through the caves" and that the "only reason it wasn't used was that they were able to
14 drain almost all the water out of the caves." *Id.*

15      As the September 4 Article reports, Mac never agreed that Musk Email #1 was "off the
16 record." *Id.* ¶ 5. Mac also never agreed that Musk Email #2 was "on background." *Id.* Musk's
17 communications with Mac were entirely by email and at no point did they speak with one another.
18 Mac Decl. ¶ 6.

19      **E.      BuzzFeed Publishes Musk's Latest Claim that Unsworth Is a "Child Rapist[]"**
20      On September 4, 2018, BuzzFeed published an article by Mac, entitled "In a New Email,
21 Elon Musk Accused a Cave Rescuer of Being a 'Child Rapist' and Said He 'Hopes' There's a
22 Lawsuit." Mac Decl. Ex. C (the "September 4 Article"). The September 4 Article republished
23 Musk Email #1 and Musk Email #2 (collectively, the "Emails") in their entirety. *Id.* As the
24 September 4 Article reported, BuzzFeed was unable to find support for Musk's allegations against
25 Unsworth. *Id.* Specifically, BuzzFeed consulted criminal records in the UK, "a Thai immigration
26 official" and Unsworth's "longtime girlfriend," but "could find no evidence" to support Musk's
27 various claims accusing Unsworth of sexually abusing children. *Id.* BuzzFeed was also able to
28 disprove Musk's assertion that Unsworth was "banned from the site" by consulting photographs of

8

1  Unsworth at the site for the duration of the rescue and by speaking with multiple divers who were

2  on the ground. *Id.* According to one of these divers, Unsworth "was never kicked off site by

3  anyone" and "was pivotal to the entire operation." *Id.*

4      The published text of the September 4 Article explains why it was perfectly appropriate for

5  BuzzFeed to publish Musk's emails despite Musk's claims that Musk Email #1 was "off the

6  record." (Bolger Decl. Ex. K ¶¶ 5-6) because he wrote "off the record" at the top of Musk Email

7  #1. Specifically, the Article informs the reader that the phrase "off the record" is not a talisman

8  that can be used to unilaterally prohibit a journalist from publishing newsworthy information. As

9  the September 4 Article explains, "[p]er common journalistic practice, a conversation is off the

10  record *only if both parties agree to the terms.*" Mac Decl. ¶ 5, Ex. C (emphasis added).[4]  To

11  illustrate this point, the September 4 Article links to an ethics handbook published by the NYU

12  School of Journalism, which confirms that off-the-record communications are "prearranged

13  agreements between a reporter and a source" that "must be arranged beforehand, never after" the

14  information is exchanged. *Id.* This basic principle of journalism was also reflected in BuzzFeed's

15  News Standards and Ethics Guide, which were freely available online and provided that

16  "[a]nonymous quotes are permitted" only after the author has "agree[d] to let them be anonymous."

17  Bolger Decl. Ex. H, p. 2.[5]  BuzzFeed was not bound by Musk's proposed restrictions on the use of

18  his Emails because, as the September 4 Article put it, Mac "did not agree to that condition of the

19  correspondence." Mac Decl. ¶ 5, Ex. C.[6]

20  ───────────────

21      [4] This basic rule of journalism is reflected in the law, which recognizes that a conversation is not off the record unless the source and the journalist mutually agree to those terms. As the U.S.

22  Supreme Court has made clear, principles of contract law determine whether a journalist will be obligated to respect his or her source's request for anonymity. *See, e.g., Cohen v. Cowles Media,*

23  501 U.S. 663, 665, 671 (1991) (holding that journalists could be held liable "for breach of a promise" to "keep [a source's] identity anonymous").

24      [5] After the September 4 Article was published, BuzzFeed added a sentence to its Standards and Ethics Guide stating that "[i]nterviews are always on the record until a reporter agrees to go off

25  the record or on background." Bolger Decl. Ex. I, p. 3.

26      [6] Two days after BuzzFeed published the September 4 Article, the *Atlantic* published an article about "Elon Musk and the meaning of 'Off the Record,'" which concluded that BuzzFeed

27  "had every right" to publish Musk's Emails. Bolger Decl. Ex. J. The *Atlantic* also expressed skepticism that Musk "actually does not understand how off-the-record situations work," given "the

28  many years that Musk has been a CEO of several companies" and the likelihood that he has undertaken "the requisite media training for people in such a role." *Id.*, pp. 5-6. The author of the

9

1      The text of the published September 4 Article also explains why there was a public interest

2  in publishing the Emails. The Emails were highly newsworthy, the Article explained, because

3  Musk's "continued campaign against Unsworth offers a glimpse into the new ability of some of the

4  world's wealthiest and most powerful figures to directly attack private citizens who cross them –

5  and will test the capacity of traditional legal tools against them." *Id.* The September 4 Article thus

6  builds on BuzzFeed's prior reporting about Musk's "extraordinarily vindictive" behavior and his

7  "utterly disproportionate" demands that even his most obscure critics "be crushed." Mac Decl. Ex.

8  A. At the end of the September 4 Article, a quote from Unsworth's lawyer sums up why it was

9  important for BuzzFeed to publish and challenge Musk's claims: "Today the rich and powerful

10  seem all too ready to tweet falsities in the hope and expectation that their wealth and position will

11  protect them. Pedophilia is too serious an issue to leave unchallenged." Mac Decl. Ex. C, p. 13.

12      **F.    The Defamation Action**

13      On September 18, 2018, Unsworth filed this Defamation Action against Musk in the United

14  States District Court for the Central District of California. It seeks damages for, among other

15  things, the statements made by Musk and repeated by BuzzFeed.

16      After his motion to dismiss was denied, Musk filed his answer on May 13, 2019. In his

17  Answer, Musk makes it clear that he believes that he should not be held responsible for the

18  statements he made in the Emails and would rather shift the blame to the reporters "hound[ing]"

19  him for "additional information." Bolger Decl. Ex. K ¶ 5. Despite the fact that Mac never agreed

20  to keep the Emails off the record, Musk ultimately blames BuzzFeed for publishing "what

21  Mr. Musk said in a private conversation" without "Mr. Musk's knowledge or approval." *Id.* ¶¶ 5,

22  6.

23

24

---

25  *Atlantic* article also warned that Musk's hostile "reaction is dangerous, particularly in an age of
media distrust, in which the president of the United States and his supporters regularly refer to

26  reporters as enemies of the people." *Id.*, p. 6. This vindictive and entitled attitude towards the
press is encapsulated by Musk Email #1, in which Musk addressed a reporter seeking comment as

27  "fucking asshole," doubled down on unsubstantiated claims that one of his critics is a "child
rapist[]," and demanded that BuzzFeed find (and publish) the evidence that Musk lacked, while

28  keeping his involvement secret. Mac Decl. Ex. C.

MOTION TO QUASH
Case No. _____

### 1.     The Subpoenas *Duces Tecum*

Musk and Unsworth have both sought – and received – documents from BuzzFeed. Unsworth served BuzzFeed with a subpoena seeking documents to establish how many people viewed certain BuzzFeed articles about Musk's dispute with Unsworth (the "Unsworth Document Subpoena"), to which BuzzFeed responded on August 23, 2019.  Bolger Decl. Exs. L, M.  At the time BuzzFeed responded to the Unsworth Document Subpoena, counsel for Unsworth agreed "not to serve another discovery subpoena." *Id*. Ex. N.

On June 17, 2019, Musk propounded a subpoena against BuzzFeed seeking copies of the August 29 and September 4 Articles as well as communications between BuzzFeed and Unsworth, communications between BuzzFeed and Musk and documents relating to BuzzFeed's policies "concerning 'off the record' or 'on background' conversations" (the "First Musk Document Subpoena"). *Id*. Ex. O.  BuzzFeed filed timely objections to the demand for BuzzFeed's communications with Musk and Unsworth because these documents were already available to the parties – including BuzzFeed's publicly available News Standards and Ethics Guide – and objected to any requests seeking irrelevant and/or privileged information.  *Id*. Ex. P.

Musk served BuzzFeed with a second document subpoena on August 21, 2019 (the "Second Musk Document Subpoena").  *Id*. Ex. Q.  The Second Musk Document Subpoena sought a copy of the version of the BuzzFeed News Standards and Ethics Guide that was on BuzzFeed's website between August and September 2018, which BuzzFeed produced. *Id.* Exs. Q, R.  The Second Musk Subpoena also demanded all documents relating to BuzzFeed's "decision to publish the contents" of Musk Email #1 and all documents relating to BuzzFeed's decision to amend its Standards and Ethics Guide after the September 4 Article was published. *Id*. Ex. Q.  BuzzFeed served timely objections on the grounds that these documents are irrelevant, protected by various privileges (including the reporter's privilege), would be unduly burdensome to search for and review. *Id*. Ex. R.

To summarize, the Articles are publicly available to the parties via BuzzFeed's website. BuzzFeed has additionally provided copies of the BuzzFeed News Standards and Ethics Guide (including the version that was available online when Musk sent Musk Email #1 to Mac) and

11

documents sufficient to show traffic to BuzzFeed's websites on dates on which articles about Musk were published.[7]

### 2.    The Subpoenas *Ad Testificandum*

Musk and Unsworth now seek to take Mac's deposition. On August 26, 2019, Musk served Mac with a subpoena noticing his deposition for September 11, 2019, at the San Francisco office of Musk's attorneys (the "Musk Deposition Subpoena"). *Id.* Ex. S. The cover letter of the Musk Deposition Subpoena states that "Mr. Musk does not intend to seek testimony from you that would be protected by the United States or California Constitutions or any other reporter's privilege," but it is silent as to what information Musk actually hopes to solicit. *Id.* On September 6, 2019, Unsworth served Mac with a subpoena cross-noticing his deposition for the same date and time as the Musk Deposition Subpoena, despite previously promising not to propound additional subpoenas for discovery. *Id.* Ex. T.

Counsel for Mac met and conferred telephonically with counsel for the parties on September 5 and 6, 2019, but Musk and Unsworth declined to withdraw the Deposition Subpoenas voluntarily. Bolger Decl. ¶ 23. During these calls, counsel for Musk indicated that he wanted to take Mac's deposition to find out why Mac had decided to publish Musk's Emails in the September 4 Article. *Id.* Musk's attorney indicated that Mac's testimony about BuzzFeed's internal deliberations around the time the September 4 Article was published are relevant to Musk's defense that he was not the proximate cause of the publication of his statements by BuzzFeed because it was not reasonably foreseeable that BuzzFeed would publish his Emails. *Id.*[8] Unsworth's attorney indicated that he also wants to question Mac about BuzzFeed's decision to publish the emails,

---

[7] To the extent that BuzzFeed has not already provided declarations authenticating any of these documents, it is willing to do so.

[8] On September 9, 2018, counsel for Musk offered to withdraw the Musk Deposition Subpoena against Mac if BuzzFeed agreed to go forward with a Rule 30(b)(6) deposition instead. Bolger Decl. Ex. U. The topics of the proposed 30(b)(6) deposition, however, amounted to a fishing expedition into BuzzFeed's editorial practices, including its "pre-publication review process" and details relating to sourcing. *Id.* These subjects are irrelevant to the Defamation Action, grossly overbroad and would invariably require BuzzFeed to reveal privileged information about its newsgathering activities. Accordingly, BuzzFeed declined to accept Musk's offer. *Id.*

12

1  presumably to rebut Musk's reasonable foreseeability defense. *Id.* The parties agreed to extend

2  Mac's time to move to quash the Deposition Subpoenas up to and including September 13, 2019.

3  *Id.* ¶ 24.

4

**ARGUMENT**

5      This Court "must quash" the Deposition Subpoenas because they "require[] disclosure of

6  privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii). At bottom, the Deposition

7  Subpoenas require Mac to disclose unpublished information about BuzzFeed's decision to publish

8  Musk's Emails in the September 4 Article, which he cannot be compelled to do given the California

9  Shield Law's absolute prohibition against forcing a journalist to reveal "any unpublished

10  information" relating to the newsgathering process. Cal. Const. art. I, § 2(b), Cal. Evid. Code §

11  1070. Since Mac is absolutely privileged against being compelled to reveal the information that is

12  being sought, the Deposition Subpoenas are not enforceable under Rule 45.

13      Rule 45 also requires the Court to quash the Deposition Subpoenas because they would

14  subject Mac to an undue burden. The testimony sought from Mac – a non-party journalist – has no

15  relevance to the underlying issues in Unsworth's Defamation Action against Musk. Moreover, the

16  parties already have access to copies of BuzzFeed's Articles, Mac's communications with the

17  parties, and BuzzFeed's Standards and Ethics Guides. To the extent these documents might be

18  relevant, they all speak for themselves and do not require any explanation from Mac. Since the

19  discovery sought would thus impose an undue burden on Mac, this Court "must quash" it. Fed. R.

20  Civ. P. 45(d)(3)(A)(iv).

21  **I.**    **THE CALIFORNIA SHIELD LAW ABSOLUTELY PROHIBITS ENFORCEMENT**

22       **OF THE DEPOSITION SUBPOENAS**

23      The Deposition Subpoenas should be quashed under Rule 45 because an order permitting

24  Musk and Unsworth "to interrogate" Mac about specific editorial decisions made by BuzzFeed

25  "would subvert the … protections for journalists' … work product provided by [the California

26  Shield Law]." *L.A. Mem'l Coliseum Comm'n v. NFL*, 89 F.R.D. 489, 496 (C.D. Cal. 1981)

27  (granting motion to quash because subpoenas against journalists were "'unreasonable and

28  oppressive' within the meaning of Fed. R. Civ. P. 45[]").

13

The California Shield Law is enshrined in both the California Constitution (art. I, § 2, subd. (b)) and in a substantially identical statute (Cal. Evid. Code § 1070). The statute provides that "[a] … reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication … cannot be adjudged in contempt … for refusing to disclose … any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." Cal. Evid. Code § 1070.[9] As the California Supreme Court has explained, "[s]ince contempt is generally the only effective remedy against a nonparty [journalist], the California enactments grant such witnesses *virtually absolute protection* against compelled disclosure." *N.Y. Times Co. v. Super. Ct.*, 51 Cal. 3d 453, 461 (1990). *See also Playboy Enters., Inc. v. Super. Ct.*, 154 Cal. App. 3d 14, 22 (1984) ("[An] order compelling production of petitioner's source materials and editorial drafts and working papers is not enforceable by contempt …."). In other words, "[t]he shield law is, by its own terms, *absolute* rather than qualified in immunizing a newsperson from contempt for revealing unpublished information obtained in the newsgathering process." *Miller v. Super. Ct.*, 21 Cal. 4th 883, 890 (1999).

As a full-time reporter employed by a prominent online news organization, Mac clearly qualifies for the California Shield Law's absolute protection. Mac Decl. ¶ 1. *See, e.g., O'Grady v. Super. Ct.*, 139 Cal. App. 4th 1423, 1466 (2006) (holding that California Shield Law applies to reporters working for "online news magazine[s]"). It is equally clear that the testimony sought from Mac – which relates to how and why BuzzFeed decided to publish the Emails – falls within the scope of the California Shield Law's protection. As a general matter, the scope of the California Shield Law is extremely broad and "encompasses all information acquired by the

---

[9] As a threshold matter, "the state law of privilege applies" here because the only cause of action is Unsworth's state law defamation claim against Musk. *Shaklee Corp. v. Gunnell*, 110 F.R.D. 190, 192 (N.D. Cal. 1986) (applying California reporters shield to subpoena issued by District of Utah seeking evidence from California reporter for use in libel case). As the Ninth Circuit explained, "Federal Rule of Evidence 501 provides that when a federal court hears a civil action in which state law provides the rule of decision, 'the privilege of a witness, … shall be determined in accordance with State law.'" *Star Editorial, Inc. v. United States Dist. Ct.*, 7 F.3d 856, 859 (9th Cir. 1993) (quoting Fed. R. Evid. 501). *See also id.* (applying California reporters' privilege to defamation action removed to federal court because "[s]tate law will clearly provide the rule of decision").

14

newsman in the course of his professional activities which he has not disseminated to the public." *L.A. Mem'l Coliseum*, 89 F.R.D. at 495 (quoting *Hammarley v. Super. Ct.*, 89 Cal. App. 3d 388, 397 (1979)).  *See also* Cal. Evid. Code § 1070(c) ("As used in this section, 'unpublished information' includes *information not disseminated* to the public by the person from whom disclosure is sought … and includes, but is not limited to, all notes, outtakes, photographs, tapes *or other data of whatever sort* …") (emphasis added).  Simply put, the California Shield Law protects "any unpublished information" obtained in the course of journalistic activity and, in this context, the "word 'any' means without limit and no matter what kind." *Delaney v. Super. Ct.*, 50 Cal. 3d 785, 798 (1990).  The "broad scope" of California's Shield Law reflects "a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment." *L.A. Mem'l Coliseum*, 89 F.R.D. at 495 (quoting *Baker v. F&F Inv.t*, 470 F. 2d 778, 782 (2d Cir. 1972)).

Courts have specifically recognized that "editorial materials," such as "documents relating to the researching, writing or editing of [an] article," fall "squarely within the ambit" of the California Shield Law.  *Playboy Enters.*, 154 Cal. App. 3d at 17-24.  Recognizing the "broad scope of protection" offered by the California Shield Law, the California Court of Appeal held that a subpoena seeking "editorial drafts and working papers is not enforceable …."  *Id.* at 22.[10]  In a case applying New York's analogous shield law, the Second Circuit explained that "it [is] virtually self-evident that the Shield Law" protects journalists from being compelled to testify about "unpublished details of the newsgathering process."  *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 109-10 (2d Cir. 2012) (holding that a journalist could not be compelled to disclose information

---

[10] Musk and Unsworth may argue that BuzzFeed waived its privilege "by having published information" that they may seek from Mac, but this argument has been resoundingly rejected.  *Id.* at 23.  The text of the California Shield Law expressly states that the privilege applies "whether or not published information based upon or related to such material has been disseminated."  *See* Cal. Const. art. I, § 2(b); Cal. Evid. Code § 1070(c).  Accordingly, the California Shield Law does not "allow the construction that its protection is inapplicable whenever unpublished information or materials could or would confirm or amplify the published information derived therefrom because nothing new would be disclosed in the source materials."  *Playboy Enters.*, 154 Cal. App. 3d at 23-24.

15

1   about the "techniques [used] for conducting his investigation, the backgrounds of [his] co-authors

2   … and whether he consulted with any experts or other sources in the course of the investigation").

3   *See also Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 478 (S.D.N.Y. 2016) ("Although none of that

4   information is confidential, the 'unpublished details of the newsgathering process' are,

5   nevertheless, protected by the Shield Law ….") (applying New York law).  Moreover, the scope of

6   the California Shield Law stretches far beyond information relating to the editorial and

7   newsgathering process; as the California Supreme Court has held, the privilege even applies to "a

8   newsperson's nonconfidential, eyewitness observations of an occurrence in a public place."

9   *Delaney*, 50 Cal. 3d at 797, 805.  *A fortiori*, any "facts in [Mac's] memory" about how and why

10  BuzzFeed decided to publish Musk's Emails are subject to the absolute protection of the California

11  Shield Law and are thus not discoverable.  *Playboy Enters.*, 154 Cal. App. 3d at 22.

12          The parties cannot circumvent the California Shield Law by declaring that they do "not

13  intend to seek testimony … that would be protected by the … reporter's privilege," as Musk has

14  done.  Bolger Decl. Ex. S.  This is because it is impossible for the parties to question Mac without

15  requiring him to reveal privileged information.  "[E]ven the most basic questions" about

16  BuzzFeed's publication of the Musk Articles require Mac to disclose "unpublished details of the

17  newsgathering process."  *Baker*, 669 F.3d at 109.  For instance, if Musk asked Mac whether the

18  September 4 Article was "accurately reported," Mac's answer "cannot be divorced from

19  unpublished material relating to the article."  *Id*. at 110.  This is because Mac's opinion as to "the

20  accuracy of a particular news article" necessarily discloses information about "the ability,

21  efficiency, and diligence of the [BuzzFeed] reportorial personnel; their newsgathering methods

22  generally and as applied in preparing the article; and [Mac's] personal knowledge and assessment

23  of these matters."  *Id*.  Conversely, any questions that do not require Mac to testify about specific

24  aspects of BuzzFeed's reporting are totally irrelevant to the Defamation Action and thus improper.

25  In short, the Deposition Subpoenas must be quashed because the questions proposed "necessarily

26  call for [Mac] to reveal [privileged] information."  *Hurry v. Fin. Industry Regulatory Auth., Inc.*,

27  2017 WL 3701955, at *1 (N.D. Cal. Ar. 7, 2017) (granting motion to quash subpoena seeking to

28  depose a non-party journalist because "the subpoena appears targeted only at privileged

16

1    information," despite the subpoenaing party's promise not to "seek information protected by

2    California's shield law").[11]

3       Ultimately, the California Shield Law vests Mac with an "absolute" privilege against being

4    forced to reveal "unpublished information obtained in the newsgathering process." *Miller*, 21 Cal.

5    4th at 890; *N.Y. Times*, 51 Cal. 3d at 461.  Since Rule 45 prohibits enforcement of a subpoena that

6    "requires disclosure of privileged or other protected matter," the Deposition Subpoenas must be

7    quashed.  Fed. R. Civ. P. 45(d)(3)(A)(iii).  *See also Ward v. News Grp. Newspapers*, 1990 WL

8    256836, at *1-2 (C.D. Cal. Aug. 25, 1990) (granting Rule 45 motion to quash subpoena served on

9    journalist because subpoena was unduly "burdensome by virtue of the fact that … a constitutional

10   'shield' exists" in the form of the California Shield Law).[12]

11

---

12      [11] It is possible that Unsworth and Musk will argue that this motion should be denied as premature in light of a decision of the California Supreme Court holding that a journalist cannot

13   seek relief under the California Shield Law until the "newsperson has been adjudged in contempt." *N.Y. Times*, 51 Cal. 3d at 459.  This argument should be disregarded since there is no sensible

14   reason why a federal court should delay its ruling, force Mac into contempt and only then enter an order quashing the Deposition Subpoenas. *See, e.g., L.A. Mem'l Coliseum*, 89 F.R.D. at 496

15   ("[T]he court sees no purpose in arbitrarily postponing a decision on these motions until after the reporters have been forced to appear with the requested documents."); Fed. R. Civ. P. 1 (the rules

16   of civil procedure "should be construed, administered, and employed by the court … to secure the just, speedy, and inexpensive determination of every action and proceeding").  Courts have

17   unsurprisingly rejected similar arguments aimed at using procedural technicalities to impose an undue burden on non-party journalists. *See, e.g., Hurry*, 2017 WL 3701955, at *2 ("The court

18   rejects the plaintiffs' argument that the proper procedure is to require [the journalist's] deposition and require serial objections to questions on the ground of privilege").

19      [12] Wholly apart from the California Shield Law, Mac has a qualified First Amendment

20   privilege against being compelled to disclose unpublished information relating to his newsgathering.  The California Supreme Court has recognized a qualified privilege in civil cases

21   that permits "a reporter, editor, or publisher … to withhold disclosure of the identity of confidential sources and of unpublished information supplied by such sources." *Mitchell v. Superior Court*, 37

22   Cal. 3d at 268 (Cal. 1984).  Courts have extended this privilege to cover "journalists' work product and resource materials as well." *L.A. Mem'l Coliseum*, 89 F.R.D. at 493 (listing cases).  A rigorous

23   showing is required to overcome the qualified privilege, which will "depend upon the consideration and weighing of a number of interrelated factors." *Mitchell*, 37 Cal. 3d at 279 (listing factors).

24   Application of these factors weighs heaving in favor of applying the privilege.  *First*, Mac's status as a non-party journalist "obviously favors nondisclosure." *O'Grady*, 139 Cal. App. 4th at 1469.

25   *Second*, Plaintiffs cannot show that the information sought by the Subpoena "goes to the 'heart'" of their claim (*Mitchell*, 37 Cal. 3d at 281) because Mac's testimony is irrelevant to the Defamation

26   Action (*see* pp. 18-20, *infra*) and merely cumulative of information that is already available to the parties. *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) (federal qualified privilege bars

27   compelled disclosure when "the requested material is … cumulative").  *Third (and finally)*, the law imposes – and courts routinely enforce – a stringent requirement that "discovery should be denied

28   unless the plaintiff has exhausted all alternative sources of obtaining the needed information." *Mitchell*, 37 Cal. App. 3d at 282.  Here, there are multiple alternate sources of obtaining

17

## II.     THE DEPOSITION SUBPOENAS IMPOSE AN UNDUE BURDEN ON MAC

In addition to being barred by the reporter's privilege, the Deposition Subpoenas must be quashed because they fail to satisfy the basic requirements for a third party subpoena. Under the Federal Rules of Civil Procedure, courts "must quash or modify a subpoena that … requires disclosure of privileged or other protected matter … or subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv). Additionally, the scope of discovery must be "proportional to the needs of the case" and courts have broad discretion to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(b)(1), (c)(1). "Of course, if the sought-after documents are not relevant, nor calculated to lead to the discovery of admissible evidence, then any burden whatsoever would be by definition undue." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680 (C.D. Cal. 2006) (citation and internal quotation marks omitted). A subpoena should also be quashed if it was "served for the purpose of annoying and harassment and not really for the purpose of getting information." *Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, 814 (9th Cir. 2003). Thus, a court determining the propriety of a subpoena balances three factors: "the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Gonzales*, 234 F.R.D. at 680. Here, all three factors weigh heavily in favor of quashing the Deposition Subpoenas.

*First*, the deposition testimony sought from Mac is not relevant to the claims and defenses at issue in the Defamation Action. The Deposition Subpoenas do not identify any of the topics Mac would be asked about at his deposition, but the parties have taken the position that Mac's testimony is relevant to the issue of whether BuzzFeed's publication of Musk's Emails was reasonably foreseeable. Bolger Decl. ¶ 23. Essentially, Musk intends to argue that he was not the proximate cause for the publication of the statements attributed to him in the September 4 Article because his Emails were "off-the-record" and were republished "without Mr. Musk's knowledge or approval." Bolger Decl. Ex. K, ¶¶ 5-6. In order to prevail on this defense, Musk must establish that BuzzFeed's republication of the Emails "was a result which [Musk] might have reasonably

information sought from Mac – most notably Musk himself and the documentary evidence that is already available.

18

foreseen as likely to occur." *Curley v. Vick*, 211 Cal. App. 2d 670, 673 (1963). *See also* Restatement (Second) of Torts § 576 cmt. (d) (1977) ("The publication of a libel … is a legal cause of any special harm resulting from its repetition by a third person if … the repetition was reasonably to be expected."); *Mitchell*, 37 Cal. 3d 268 (stating California courts follow the restatement rule). Conversely, Unsworth seeks to prove that it was reasonably foreseeable that BuzzFeed would publish his comments. Bolger Decl. ¶ 23. But the testimony sought from Mac is totally irrelevant. The parties want Mac to explain why BuzzFeed decided to publish the Emails, but Mac's subjective impressions about this decision have no bearing on the actual legal issue – whether republication was reasonably foreseeable *to Musk* at the moment he sent Mac the Emails.

The irrelevance of Mac's testimony is underscored by decisions in prior defamation cases in which courts considered the issue of reasonable foreseeability. In all of these cases, the court focused exclusively on the primary publisher at the time of publication (*i.e.*, Musk); in none of these cases did the court consider the state of mind of the secondary publisher (*i.e.*, Mac). *See, e.g.*, *Schneider v. United Airlines, Inc.*, 208 Cal. App. 3d 71, 75 (1989) (holding republication was reasonably foreseeable because original publisher should have anticipated its statements to credit reporting agencies would be disseminated to third parties); *McKinney v. Cty. of Santa Clara*, 110 Cal. App. 3d 787, 798 (1980) (finding republication was reasonably foreseeable because "it was reasonably foreseeable by [the original publisher]") (cited approvingly by *Mitchell*, 37 Cal. 3d 268); *Canatella v. Van De Kamp*, 486 F.3d 1128, 1135 (9th Cir. 2007) (holding that republication was not reasonably foreseeable because original publisher had no reason to believe its statement would be republished four years later); *Chandler v. Berlin*, 2019 WL 1471336, at *4 (D.D.C. Apr. 3, 2019) (holding that republication was not reasonably foreseeable because the original publisher "could not have predicted" that the statements at issue would be republished) (citing *Bryan v. News Corp.*, 2018 WL 720057, at *10 (Cal. Ct. App. Feb. 6, 2018) (framing "critical question" to determine reasonable foreseeability as "whether the repetition was to reasonably expected, i.e., foreseeable, by [original publisher]")). In other words, the reasonable foreseeability analysis asks whether "a reasonable person would recognize that his actions create an unreasonable risk that the defamatory matter will be communicated to other parties." *Stephan v. Baylor Med.*

19

1 | *Ctr. at Garland*, 20 S.W.3d 880, 889 (Tex. Ct. App. 2000). The answer to this question depends on

2 | Musk, not Mac.

3 | Simply put, Mac's testimony about why BuzzFeed ultimately decided to publish Musk's

4 | statements is totally irrelevant to the legal issue actually in dispute – which is whether Musk (not

5 | Mac) should have foreseen the risk that his statements would be republished. Mac's subjective

6 | opinions about why BuzzFeed published Musk's statements – which were never expressed to Musk

7 | – are clearly not relevant to the issue of whether Musk should have known that the Emails would be

8 | republished at the time he sent them. "Given the obvious First Amendment concerns at play in

9 | compelling a non-party journalist to testify, combined with the limited value of the deposition

10 | plaintiff seeks," it is clear that the Deposition Subpoenas "places an undue burden on [Mac]" and

11 | must be quashed. *Baez v. JetBlue Airways*, 2012 WL 5471229, at *2 (E.D.N.Y. Nov. 9, 2012). *See*

12 | *also Hurry*, 2017 WL 3701955, at *2 (quashing subpoena on non-party reporter because, "[t]o the

13 | extent that [the] information [sought] is not privileged, it is of limited relevance to the … lawsuit").

14 | *Second*, the parties have no need to depose Mac because they already have all the evidence

15 | they need to determine whether BuzzFeed's republication of Musk's emails were reasonably

16 | foreseeable: they have Musk's deposition testimony (which Unsworth's counsel has tweeted will

17 | reveal the "truth" that "[t]he emperor has no clothes") (Bolger Decl. Ex. V) and should have access

18 | to all of Mac's communications with Musk. Moreover, since Mac never actually spoke with Musk,

19 | their written correspondence – which is already in evidence – constitutes the sum total of their

20 | communications during the relevant time period. These documents all speak for themselves.

21 | Musk may also attempt to argue that he was justified in believing that the Emails were

22 | legitimately off the record. He is wrong (*see* pp. 8-9, *supra*), but even so there is no need to depose

23 | Mac to make the argument that a source can unilaterally declare communications to be off the

24 | record simply by writing those words at the top of the email. For instance, if Musk wants to argue

25 | that he misinterpreted the BuzzFeed Standards and Ethics Guide, he is free to do so because

26 | BuzzFeed has produced all the versions of that document that were available during the relevant

27 | time period. Similarly, if Musk wants to argue that he is right about how off-the-record

28 | communications work – and that every practitioner of journalism is wrong – he can try to engage an

20

1  expert in order to back up his claims.  But there is no need for Mac to testify, especially since his
2  personal opinions about journalistic ethics have no bearing on the question of whether Musk
3  justifiably believed that the Emails were off the record.

4      The parties also have copies of all relevant articles published by BuzzFeed, including the
5  August 29 and September 4 Articles (collectively, the "Articles").  These articles all speak for
6  themselves on the very subject that the parties seek to question Mac about, *i.e.*, why BuzzFeed
7  published Musk's Emails.  For instance, the September 4 Article explains that although "Musk
8  prefaced one email with 'off the record,'" Musk Email #1 was not off the record because
9  "BuzzFeed News did not agree to that condition of the correspondence."  Mac Decl. Ex. C, p. 2.
10  The September 4 Article also states that BuzzFeed "did not agree" that Musk Email #2 was "on
11  background" and was thus under no obligation to withhold Musk's name.  Mac Decl. Ex. C, p. 8.
12  And although it should be readily apparent why Musk's Emails calling Unsworth a "child rapist"
13  are newsworthy, the September 4 Article also explains that these comments were published to
14  "offer[] a glimpse into the new ability of some of the world's wealthiest and most powerful figures
15  to directly attack private citizens who cross them."  Mac Decl. Ex. C, p. 4.  In short, there is no
16  need to ask Mac to explain why BuzzFeed published the Emails because the September 4 Article –
17  which is publicly available and for which BuzzFeed supplied an authenticating declaration – has
18  explained this decision already.

19      *Third*, the Deposition Subpoenas should be quashed because the only practical purpose for
20  deposing Mac – a non-party journalist – would be to subject him to harassment from Musk's
21  attorneys.  As a general matter, the latitude for taking discovery from non-parties like Mac "would
22  be more limited to protect third parties from harassment."  *Dart Indus. Co. v. Westwood Chem. Co.*,
23  649 F.2d 646, 649 (9th Cir. 1980) (citation omitted).  Courts are also responsible for ensuring that
24  journalists are not unduly mistreated by vindictive litigants.  As Justice Powell once wrote:

25      [N]o harassment of newsmen will be tolerated.  If a newsman believes that
26      [discovery] is not being conducted in good faith he is not without remedy.
27      Indeed, if the newsman is called upon to give information bearing only a remote
28      and tenuous relationship to the subject of the investigation … he will have access

21

1         to the court on a motion to quash and an appropriate protective order may be

2         entered.

3  *Branzburg v. Hayes*, 408 U.S. 665, 709-10 (1975) (Powel, J., concurring).  Time and again, courts

4 have intervened to prevent litigants from harassing journalists with needlessly intrusive discovery.

5 *See, e.g.*, *L.A. Mem'l Coliseum*, 89 F.R.D. at 496 (quashing "unreasonable and oppressive"

6 subpoenas seeking unpublished materials relating to journalists' reporting); *Baez*, 2012 WL

7 5471229, at *2 (quashing subpoena "[g]iven the obvious First Amendment concerns at play in

8 compelling a non-party journalist to testify"); *Shoen v. Shoen*, 5 F.3d 1289, 1301 (9th Cir. 1993)

9 (Kleinfeld, J., concurring) (noting that "[a] rough deposition can be an intimidating experience" for

10 a journalist and that "[c]ourts typically and correctly shy away from discovery orders where First

11 Amendment interests may be implicated"), *appeal after remand*, 48 F.3d 412 (9th Cir. 1995).

12        Harassment is not a merely hypothetical concern in this case given Musk's long history of

13 attacking his critics in the press and considering his obvious hostility towards Mac.  In its Musk at

14 War Article, BuzzFeed reports multiple instances of Musk "being easily angered and

15 'extraordinarily vindictive,' no matter how small the outlet or tempered the critique."  Mac Decl.

16 Ex. A, p. 9.  For instance, Musk publicly called a *New York Times* contributor "a huge douchebag

17 and an idiot" for questioning why Tesla should receive tax-payer backed federal loans.  *Id.*  He

18 compared another reporter to "disgraced journalist Jayson Blair for writing about how his divorce

19 could materially affect Tesla's business."  *Id.*  And, as one former Tesla employee recalled, Musk

20 would "read an obscure critical post by, like, some Belgian blogger at 3 in the morning and he'll

21 wake up people on the comms team and demand this person be crushed.  It's all utterly

22 disproportionate in response."  *Id.* at 12.  On top of his antipathy towards reporters generally, Musk

23 clearly harbors personal animosity against Mac personally.  This much is clear from the opening

24 line of Musk Email #1: "I suggest that you call people you know in Thailand, find out what's going

25 on and stop defending child rapists, you fucking asshole."  Mac Decl. Ex. C, p. 3.  In short, it is

26 clear from Musk's prior conduct that he would put Mac through the ordeal of a hostile deposition

27 for no reason other than to retaliate against Mac for his critical reporting.  The Deposition

28 Subpoenas must be quashed to avoid this oppressive outcome.

1     In sum, the Deposition Subpoenas are unduly burdensome – the testimony sought is not

2  relevant to reasonable foreseeability (or any other issue in this action), there is no need for Mac to

3  testify given that the parties already have all the relevant evidence and it is clear that harassment is

4  Musk's ulterior motive in seeking to compel Mac's deposition.  Since the proposed deposition

5  would thus impose an undue burden on Mac, this Court must quash the Deposition Subpoenas

6  pursuant to Rule 45.

7                   **CONCLUSION**

8     For the reasons set forth above, the Deposition Subpoenas should be quashed pursuant to

9  Rule 45 because they seek information that is absolutely protected under the California Shield Law

10  and also subject to the qualified First Amendment reporters' privilege and because they impose an

11  undue burden on non-party journalist Mac.

13  Dated:  September 13, 2019        DAVIS WRIGHT TREMAINE LLP
                                THOMAS R. BURKE
14                         KATHERINE M. BOLGER (*pro hac vice* forthcoming)
                         JOHN M. BROWNING (*pro hac vice* forthcoming)
15                         KATHLEEN E. FARLEY (*pro hac vice* forthcoming)

17 

18                 By:  _____
                         Thomas R. Burke

19               Attorneys for Non-Party Journalist Ryan Mac

23