QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (pro hac vice pending)
  alexspiro@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Robert M. Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| VERNON UNSWORTH,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>ELON MUSK,<br><br>　　　　Defendant. | Case No. 3:19-mc-80224-JSC<br><br>**DEFENDANT'S OPPOSITION TO MOTION OF NON-PARTY RYAN MAC TO QUASH THE DEPOSITION SUBPOENA**<br><br>Date:  October 17, 2019<br>Time:  9:00 a.m.<br>Courtroom:  Courtroom F - 15th Floor<br>Judge:  The Honorable Magistrate Judge Jacqueline Scott Corley |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .....................................................................................................................2

    A.     The Thai Cave Rescue ............................................................................2

    B.     Mr. Musk's Statements Concerning Mr. Unsworth ...................................3

    C.     BuzzFeed's Publication Of The Allegedly Defamatory Statements .........6

    D.     Mr. Mac Publicly Discusses BuzzFeed's Policies .....................................7

    E.     Mr. Musk's Efforts To Obtain Discovery From BuzzFeed .......................8

ARGUMENT ..........................................................................................................................10

I.     MR. MAC FAILS TO DEMONSTRATE THAT THE SHIELD LAW REQUIRES
      QUASHING THE DEPOSITION SUBPOENA ................................................10

    A.     The Shield Law Does Not Apply to a Motion to Quash. .........................10

    B.     The Shield Law Does Not Cover the Testimony Sought Here. ...............12

    C.     Mr. Mac Waived Any Protection of the Shield Law ..............................16

II.    MR. MAC FAILS TO DEMONSTRATE THAT THE DEPOSITION SUBPOENA
      IS UNDULY BURDENSOME OR HARASSMENT .......................................18

CONCLUSION ……………………………………………………………………….......21

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page**

3

### <u>Cases</u>

4

5
*Ayala v. Ayers,*
  668 F. Supp. 2d 1248 (S.D. Cal. 2009) ................................................................ 16, 17

6

*Baez v. JetBlue Airways,*
7
  2012 WL 5471229 (E.D.N.Y. Nov. 9, 2012) ................................................ 16, 19, 21

8
*Baker v. Goldman Sachs & Co.,*
  669 F.3d 105 (2d. Cir. 2012) ........................................................................................ 16

9
*Branzburg v. Hayes,*
10
  408 U.S. 665 (1972) ........................................................................................................ 20

11
*Delaney v. Superior Court,*
  50 Cal. 3d 785 (1990) .............................................................................................. 11, 13

12
*In re Ex Parte Apple Inc.,*
13
  2012 WL 1570043 (N.D. Cal. May 2, 2012) .......................................................... 19

14
*Giuffre v. Maxwell,*
  221 F. Supp. 3d 472 (S.D.N.Y. 2016) ...................................................................... 16

15
*Guice-Mills v. Forbes,*
16
  819 N.Y.S.2d 432 (N.Y. Sup. Ct. 2006) ................................................................. 17

17
*Hurry v. Fin. Industry Regulatory Auth., Inc.,*
  2017 WL 3701955 (N.D. Cal. Apr. 7, 2017) .................................................... 12, 19

18
*J2 Glob. Commc'ns, Inc,*
19
  2009 WL 10671967 (C.D. Cal. June 24, 2009) ...................................................... 20

20
*KSDO v. Superior Court,*
  136 Cal. App. 3d 375 (1982) ................................................................................. 11, 14

21
*L.A. Memorial Coliseum Commission v. NFL,*
22
  89 F.R.D. 489 (C.D. Cal. 1981) ........................................................................ 12, 15, 21

23
*Lozman v. City of Riviera Beach,*
  2014 WL 12360697 (S.D. Fla. Oct. 8, 2014) ......................................................... 17

24
*Miller v. Superior Court,*
25
  21 Cal. 4th 883 (1999) .................................................................................................... 16

26
*Mitchell v. Superior Court,*
  37 Cal. 3d 268 (1984) .............................................................................................. 14, 18

27
*New York Times Co. v. Superior Court,*
28
  51 Cal. 3d 453 (1990) ................................................................................ 11, 12, 15, 16

1

*News-Journal Corp. v. Carson*,
   741 So. 2d 572 (Fla. Dist. Ct. App. 1999) .................................................................... 17

2

*Oppenheimer Fund, Inc. v. Sanders*,
3   437 U.S. 340 (1978) ...................................................................................................... 12

4  *Pinkard v. Johnson*,
   118 F.R.D. 517 (M.D. Ala. 1987) ............................................................................... 16

5

*Playboy Enterprises, Inc. v. Superior Court*,
6   154 Cal. App. 3d 14 (1984) ............................................................................... 13, 16, 17

7  *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*,
   2017 WL 2806897 (C.D. Cal. Mar. 30, 2017) ............................................................ 20

8

*Rancho Publications v. Superior Court*,
9   68 Cal. App. 4th 1538 (1999) ...................................................................................... 13

10  *Shoen v. Shoen*,
   5 F.3d 1289 (9th Cir. 1993) .......................................................................................... 21

11

*In re Venezia*,
12   191 N.J. 259 (2007) ................................................................................................. 16, 17

13  *Wit v. United Behavioral Health*,
   2016 WL 258604 (N.D. Cal. Jan. 21, 2016) ......................................................... 12, 14

14

**Statutory Authorities**

15

16  Cal. Evid. Code § 1070 .............................................................................. 11, 13, 14, 15

17

**Rules and Regulations**

18  Fed. R. Civ. P. 1 ........................................................................................................... 12

19  Fed. R. Civ. P. 26(b)(1) ................................................................................................ 12

20  Fed. R. Civ. P. 26(c)(1) ................................................................................................ 20

21  Fed. R. Civ. P. 30(b)(6) ................................................................................................ 20

22  N.D. Cal. Local Rule 8-1(c) ......................................................................................... 20

23

**Constitutional Provisions**

24

Cal. Const. art. I, § 2(b) .......................................................................................... 11, 15

25

26

27

28

DEFENDANT'S OPPOSITION TO MOTION TO QUASH

# PRELIMINARY STATEMENT

To quash a deposition subpoena Defendant Elon Musk served on non-party Ryan Mac, Mr. Mac has invoked California's Shield Law, Evidence Code section 1070, for a purpose the law does not serve. The Shield Law's protections are limited to "unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." Before Mr. Mac filed this motion, Mr. Musk conveyed to Mr. Mac and his employer, BuzzFeed News, that Mr. Musk does not seek such information. Instead, Mr. Musk seeks information concerning the generally applicable guidelines and policies of Mr. Mac and BuzzFeed News with regard to honoring requests to treat information provided on an "off the record" basis, standards for sourcing articles, and policies for assessing potentially defamatory content.

That information bears on matters directly at issue in this lawsuit. Plaintiff Vernon Unsworth is suing Mr. Musk over information Mr. Musk provided to Mr. Mac on an off-the-record basis, which Mr. Mac and BuzzFeed republished anyway. A key issue in the case is whether it was reasonably foreseeable to Mr. Musk that Mr. Mac and BuzzFeed would ignore the off-the-record qualification that Mr. Musk conspicuously placed in his email, disregard his request that Mr. Mac investigate the matter before writing about it further, and publish the information with attribution to Mr. Musk. BuzzFeed's guidelines for treating such information, which it modified after it republished Mr. Musk's remarks, bear on that question. And neither the Shield Law nor the interests it serves are implicated by this discovery.

To avoid this motion, Mr. Musk offered to convert the Mac deposition to a Rule 30(b)(6) deposition of BuzzFeed News, with topics to be negotiated with BuzzFeed on these issues, to ensure Mr. Musk obtains the discovery he needs without intruding into any legitimate BuzzFeed interests. BuzzFeed rejected any compromise, even though it would have allowed BuzzFeed to produce a witness *other* than Mr. Mac and would have memorialized the avoidance of any matters that fall within the Shield Law. Mr. Musk's offer underscores that he is not seeking discovery into matters that fall within the statute or targeting Mr. Mac.

But even if the Shield Law had some connection to the discovery sought here, Mr. Mac has waived any rights he would have to block this discovery. That is because he has publicly written

1    and given interviews about his decision to publish Mr. Musk's off-the-record remarks.  Mr. Mac

2    cannot do that—inject himself publicly into this controversy—and then refuse to be examined on

3    the grounds that doing so would violate a law designed to protect his sources but not his conduct.

4    The statute is not, as Mr. Mac would have it, a ban on deposing journalists.

5        In any event, even if none of that were true, the Shield Law has no application here

6    because it prohibits a Court only from finding Mr. Mac in contempt.  The California Supreme

7    Court has made clear that the statute does not create a "reporter's privilege" from discovery, only

8    an immunity from a finding of contempt.  No one has moved to hold Mr. Mac in contempt.

9        As a fallback, Mr. Mac seeks to avoid testifying on the grounds that it would be

10   burdensome and that he is being "harassed."  That is specious.  That Mr. Musk specifically offered

11   to negotiate a compromise for a BuzzFeed representative other than Mr. Mac to testify guts any

12   argument that Mr. Musk is targeting Mr. Mac.  And the fact that Mr. Musk seeks relevant

13   information not covered by the Shield Law through a single deposition of a BuzzFeed employee

14   forecloses any argument based on burden.

15       The Court should deny the motion and order Mr. Mac's deposition to proceed promptly.

16                                    **BACKGROUND**

17       **A.    The Thai Cave Rescue**

18       On June 23, 2018, twelve members of a Thai youth soccer team and their coach went

19   missing in the Tham Luang Cave System in Thailand's Chiang Rai province.  (Schwartz Decl. Ex.

20   1 ¶ 1; Bolger Decl. Ex. W ¶ 23).  Within days, an international search and rescue mission began.

21   (Schwartz Decl. Ex. 1 ¶ 2; Bolger Decl. Ex. W ¶¶ 2, 3, 23-61).  Unsworth is a caver who, among

22   others, had mapped and was familiar with the cave system.  (Bolger Decl. Ex. W ¶ 27).  He

23   contacted divers and advised the rescue team about where the missing boys might be found.  (*Id.* ¶

24   41).  Beyond that, he did not assist in the rescue or participate in any of the cave diving necessary

25   to the rescue.  (*Id.* ¶ 52).

26       As the rescue mission began, Mr. Musk offered his assistance after a Twitter user inquired

27   as to his ability to help.  (Schwartz Decl. Ex. 2 ¶¶ 4-5; Bolger Decl. Ex. A).  Mr. Musk then

28   inquired with Thai officials, Thai companies, and the rescue divers, who confirmed his assistance

1   would be useful.  (Schwartz Decl. Ex. 2 ¶¶ 6-7).  He immediately mobilized a team of 50 of his

2   top engineers, manufacturers, and logistical specialists at SpaceX, Tesla, and The Boring

3   Company to help rescue the stranded boys.  (*Id.* ¶ 8).

4       Mr. Musk dispatched engineers to Thailand and, based on the information learned, Mr.

5   Musk and his team worked on three primary rescue strategies: surveying the cave to potentially

6   drill to the trapped boys, providing back-up power sources and water pumps if the weather

7   conditions worsened, and creating three different versions of a mini-submarine that could be used

8   to ferry those trapped through the flooded cave to safety.  (*Id.*).  Between Friday July 6 and

9   Sunday July 8, a team of engineers from SpaceX (including Mr. Musk) worked on designing,

10  manufacturing, and testing the mini-submarines, based on input from the head of the British dive

11  team leading the rescue.  (*Id.* ¶¶ 10, 13).

12      On July 8, Thai and British divers successfully rescued an initial group of boys. (Bolger

13  Decl. Ex. W ¶¶ 54-65).  That day, Mr. Musk asked if the mission still needed his assistance and

14  was told the submarine might be used, depending on weather conditions.  (Schwartz Decl. Ex. 2 ¶

15  11; Schwartz Decl. Ex. 3).  Mr. Musk and his team worked around the clock, finished the most

16  promising versions of the mini-submarine, and flew with them for 18 hours to Chiang

17  Rai.  (Schwartz Decl. Ex. 2 ¶ 13).

18      Ultimately, the monsoon rains held off, the pumps continued to work, and the team was

19  rescued without use of the mini-submarine.  (Bolger Decl. Ex. W ¶¶ 65-69; Schwartz Decl. Ex. 2 ¶

20  14).  Nonetheless, Mr. Musk donated the submarines and ten power cells to the Thai Navy for use

21  in future rescue missions.  (Schwartz Decl. Ex. 2 ¶ 15).  The Thai prime minister personally

22  thanked Mr. Musk for his assistance.  (Schwartz Decl. Ex. 2 ¶ 16; Schwartz Decl. Ex. 4).

23      **B.      Mr. Musk's Statements Concerning Mr. Unsworth**

24      On July 13, 2018, Mr. Unsworth gave an interview to CNN International.  (Schwartz Decl.

25  Ex. 1 ¶ 32).  The reporter asked him what his "thoughts on Mr. Musk's idea was."  (Schwartz

26  Decl. Ex. 1 ¶ 34; Schwartz Decl. Ex. 5).  Mr. Unsworth smirked and said that Mr. Musk "can stick

27  his submarine where it hurts."  (*Id.*).  He stated that the submarine "had absolutely no chance of

28  working," "wouldn't have gone round any corners or round any obstacles," and "wouldn't have

1     made the first fifty meters into the cave." (*Id.*).  He claimed that Mr. Musk was "asked to leave

2     [the rescue site] very quickly, as he should have been."  He dismissed Mr. Musk's efforts as "just

3     a PR stunt." (*Id.*).

4            On July 15, 2018, Mr. Musk saw Mr. Unsworth's CNN interview.  (Schwartz Decl. Ex. 1 ¶

5     35).  Given the altruistic motives that had inspired his and his colleagues' huge commitment of

6     time and resources, and the fact that he had never met nor even heard of Mr. Unsworth, he was

7     stunned.  (Schwartz Decl. Ex. 2 ¶¶ 6-15).  Mr. Musk wrote a few tweets, contradicting Mr.

8     Unsworth's false claims that Mr. Musk was "asked to leave [the rescue site] very quickly" and that

9     his participation was driven by questionable motives and rebutting the claim that he "had no

10     conception of what the cave passage looked like." (Schwartz Decl. Ex. 1 ¶¶ 37-38; Schwartz Decl.

11     Ex. 6).  Mr. Musk referred to Mr. Unsworth as "sus," or suspicious, "just a weird guy … looking

12     for press."  (Schwartz Decl. Ex. 1 ¶ 38; Schwartz Decl. Ex. 2 ¶ 25).

13            Mr. Musk also responded to Mr. Unsworth's assertion that the submarine "had absolutely

14     no chance of working" by tweeting that "[w]e will make [a video] of the mini-sub/pod going all

15     the way to Cave 5 no problem."  (Schwartz Decl. Ex. 1 ¶ 42).  He concluded by answering Mr.

16     Unsworth's colorful language about his motives with colorful language of his own, "[s]orry pedo

17     guy, you really did ask for it."  (Schwartz Decl. Ex. 1 ¶ 42; Schwartz Decl. Ex. 7).  Mr. Musk

18     testified that "pedo guy" was a common insult used in South Africa during his youth, synonymous

19     with "creepy old man" and aimed at mocking a person's appearance and demeanor, not an

20     accusation of pedophilia.  (Schwartz Decl. Ex. 1 ¶¶ 43-44; Schwartz Decl. Ex. 2 ¶ 28).  Within

21     hours of their publication, Mr. Musk deleted the tweets and apologized for the heated language.

22     (Schwartz Decl. Ex. 1 ¶¶ 49-50; Schwartz Decl. Ex. 8).

23            Two days later, a private investigator emailed Mr. Musk and offered to conduct an

24     investigation of Mr. Unsworth.  (Schwartz Decl. Ex. 9).  The following month, Mr. Musk, through

25     the president of his home office, retained the investigator, ultimately paying more than $50,000 for

26     the investigation.  (Schwartz Decl. Ex. 1 ¶¶ 51, 54; Schwartz Decl. Ex. 10 ¶¶ 4, 8; Schwartz Dec.

27     Ex. 11).

28

Days after he was retained, the investigator reported troubling facts about Mr. Unsworth. On August 17, the investigator advised that "there is indeed an unpleasant undertone to some of his lifestyle choices" and "[t]here is no question that [he] 'associates' locally with Europeans who enjoy 'Thai comforts' that are not acceptable in a developed society." (Schwartz Decl. Ex. 1 ¶ 55; Schwartz Decl. Ex. 12). On a follow-up phone call, the investigator stated that there was evidence that Mr. Unsworth met and began a relationship with his alleged Thai wife when she was eleven or twelve years old. (Schwartz Decl. Ex. 1 ¶ 56; Schwartz Decl. Ex. 10 ¶ 12). The investigator later reported that Mr. Unsworth's alleged Thai wife may have been 18 when they first met, but that this was "NOT verified," and later repeated the fact that she was eleven or twelve years old. (Schwartz Decl. Ex. 1 ¶¶ 58, 61; Schwartz Decl. Ex. 10 ¶ 16; Schwartz Decl. Ex. 13). On August 27, the investigator reported that Mr. Unsworth had frequently traveled to Thailand since the 1980s and that he was a "Manther"—an older man who prefers young women. (Schwartz Decl. Ex. 1 ¶ 59; Schwartz Decl. Ex. 13). All of this information was relayed to Mr. Musk. (Schwartz Decl. Ex. 1 ¶¶ 57, 60; Schwartz Decl. Ex. 10 ¶ 15; Schwartz Decl. Ex. 2 ¶ 35).

In late August 2018, the investigator reported that Mr. Unsworth spent significant time in Pattaya Beach—a known hotspot for prostitution and sex tourism, that Mr. Unsworth associated with other European expatriates with nefarious sexual proclivities, and that Mr. Unsworth was unpopular at the Thai Cave Rescue because others regarded him as "creepy." (*Id.*). On August 30, a preliminary investigative report included the following findings:

- "Mr. Unsworth has been a frequent visitor to Thailand since the 1980s. Prior to meeting his current wife we believe that Mr. Unsworth was living in the Pattaya Beach…Pattaya Beach is synonymous with prostitution and scam artists."

- "The sexpat whore-mongers his way through the go-go bars of Thailand. His only other friends are his sexpat peers. Peek-density occurs in and around Pattaya – Thailand's sin city."

- "[S]ome of the UK and Dutch divers who also volunteered stated that Mr. Unsworth was not a popular or particularly liked man in the Cave Rescue Team. When pushed as to why, they simply replied 'Creepy.'"

1    (Schwartz Decl. Ex. 1 ¶¶ 66-67; Schwartz Decl. Ex. 14).

2        **C.    BuzzFeed's Publication Of The Allegedly Defamatory Statements**

3        On August 28, 2018, just days after Mr. Musk heard the investigator's initial findings, a

4    reporter for TechCrunch tweeted at Mr. Musk "your dedication to facts and truth would have been

5    wonderful if applied to that time when you called someone a pedo." (Schwartz Decl. Ex. 1 ¶ 62;

6    Schwartz Decl. Ex. 15). In response, and with knowledge of the investigator's initial findings, Mr.

7    Musk replied "[y]ou don't think it's strange he hasn't sued me? He was offered free legal

8    services." (*Id.*). Mr. Unsworth's attorney, Lin Wood, tweeted a response to Mr. Musk stating

9    "@elonmusk should check his mail before tweeting" and attaching a copy of a demand letter.

10   (Schwartz Decl. Ex. 1 ¶ 70; Schwartz Decl. Ex. 16).

11       On August 29, 2018, Mr. Mac emailed Mr. Musk about the demand letter Mr. Unsworth's

12   counsel had sent to Mr. Musk. (Schwartz Decl. Ex. 1 ¶ 71). On August 30, Mr. Mac sent a

13   follow-up email. (Schwartz Decl. Ex. 1 ¶ 72; Schwartz Decl. Ex. 17).

14       Mr. Musk sent two emails in response. (Schwartz Decl. Ex. 1 ¶ 73). In the first, he

15   relayed the investigator's findings as they were represented to him and implored Mr. Mac to "call

16   people you know in Thailand, find out what's actually going on." (Schwartz Decl. Ex. 1 ¶ 77;

17   Schwartz Decl. Ex. 17). He wrote that Mr. Unsworth had been "traveling to or living in Thailand

18   for 30 to 40 years, mostly Pattaya Beach, until moving to Chiang Rai for a child bride that was

19   about 12 years old at the time," which is what Mr. Birchall had told him the investigator had

20   reported. (Schwartz Decl. Ex. 1 ¶¶ 80-81; Schwartz Decl. Ex. 2 ¶ 45). Based on this, Mr. Musk

21   referred to Mr. Unsworth as a "child rapist[]." (Schwartz Decl. Ex. 1 ¶ 79). He wrote that

22   "there's only one reason people go to Pattaya Beach. It isn't where you go for caves, but it is

23   where you'd go for something else," which was also consistent with the investigator's reports to

24   Mr. Birchall. (Schwartz Decl. Ex. 1 ¶¶ 82-83; Schwartz Decl. Ex. 2 ¶ 46). It stated that "Chiang

25   Rai is renowned for child sex-trafficking," which was supported by a Google search Mr. Musk

26   provided in the email. (Schwartz Decl. Ex. ¶¶ 84-85; Schwartz Decl. Ex. 17). He wrote, as had

27   been reported to him, that "most of the actual dive team refused to hang out with [Mr. Unsworth.]"

28   (Schwartz Decl. Ex. 1 ¶¶ 86-87; Schwartz Decl. Ex. 2 ¶ 48). Mr. Musk conspicuously wrote "Off

the record" at the start of the email.  (Schwartz Decl. Ex. 1 ¶ 74; Schwartz Decl. Ex. 17).  Mr.

Musk did not intend for his email to become public without independent verification.  (Schwartz

Decl. Ex. 1 ¶¶ 74-75; Schwartz Decl. Ex. 2 ¶ 43).

In his second email, designated "On background," Mr. Musk responded to Mr. Unsworth's

claims that he was asked to leave the rescue site, that the submarine would not fit, and that his

involvement was "just a PR stunt."  (Schwartz Decl. Ex. 1 ¶¶ 89-90; Schwartz Decl. Ex. 18).

Five days later, on September 4, Mr. Mac responded to Mr. Musk and said he intended to

publish the emails because "he didn't agree for the conversation to be off the record."  (Schwartz

Decl. Ex. 1 ¶¶ 94-95; Schwartz Decl. Ex. 17).[1]  Mr. Musk responded that "[w]e haven't had a

conversation at all.  I sent you an off the record email, which very clearly and unambiguously said,

'off the record.'  If you want to publish off the record comments and destroy your journalistic

credibility, that's up to you.  As for answering more questions, I would be happy to do so, but not

with someone who just told me that they will not honor accepted rules of journalism."  (Schwartz

Decl. Ex. 1 ¶ 96; Schwartz Decl. Ex. 17).

That same day, BuzzFeed published an article about Mr. Musk's off-the-record comments

and included reprints of the emails that Mr. Musk had designated as off-the-record and on-

background.  (Schwartz Decl. Ex. 1 ¶ 103; Bolger Decl. Ex. W at Ex. K).  At the time of the

September 4 publication, BuzzFeed's own editorial standards lacked any statement that comments

would not be treated as "off-the-record" absent an agreement by the reporter.  As Mr. Mac's

motion notes, "[a]fter the September 4 Article was published, BuzzFeed added a sentence to its

Standards and Ethics Guide stating that '[i]nterviews are always on the record until a reporter

agrees to go off the record or on background.'"  Mot. at 9 n.5 (citing Bolger Decl. Ex. I, p. 3).

### D.   Mr. Mac Publicly Discusses BuzzFeed's Policies

Soon after Mr. Mac's publication of the off-the-record email, Mr. Mac gave an interview

---

[1]  BuzzFeed disingenuously states that "although it should be readily apparent why Musk's Emails calling Unsworth a 'child rapist' are newsworthy, the September 4 Article also explains that these comments were published to 'offer[] a glimpse into the new ability of some of the world's wealthiest and most powerful figures to directly attack private citizens who cross them.'"  Mot. at 21.  But, in designating his comments "off the record," Mr. Musk specifically indicated that the information should *not* be published unless Mr. Mac verified the truth of the statements through other sources.

to *The Atlantic* on the topic of the newsworthiness of the September 4 article and his practices for respecting a source's "off-the-record" request.  (Bolger Decl. Ex. J.)  As the September 6 *Atlantic* article notes, the meaning of off-the-record "remains murky," given that "[j]ournalists and members of the general population, which include their potential sources, often have very different definitions for what it means to be 'off the record.'"  (*Id.*)  That's because "[w]hen sources tell reporters they want something 'off the record,' there's little ambiguity in the statement.  Don't print that."  (*Id.*)  As the *Atlantic* article recounts:

> Mac could have conceded to Musk's wishes, if he and his editors decided that the contents of the emails—an apparent reversal of Musk's earlier public remarks about Unsworth—weren't newsworthy. But they did, and they had every right to do so. "I think people that understand how this works and how 'off the record' works understand how important this story is and why we published this story, and that we did everything in the right," Mac told me over the phone.

> Another publication may have determined the emails weren't worth publishing. BuzzFeed's judgment was certainly in the letter of journalistic law. Whether it was in the spirit of it is a different question with multiple answers, and good fodder for discussion of general editorial decision-making.

> (*Id.*)

Mr. Mac also spoke with and exchanged private Twitter messages with a journalist concerning his decision to publish the exchange with Mr. Musk and agreed to let him share the content of these messages on *Medium*.  (Schwartz Decl. Ex. 19).  As an article posted on *Medium* explains, both Mr. Mac and the editor-in-chief of BuzzFeed News answered questions and consented to publication of the Twitter messages.  (*Id.*)  The resulting article questions whether BuzzFeed News published Mr. Musk's emails in good faith and highlights that BuzzFeed News's guidelines at the time "d[id]n't have anything specific about on the record and off the record."  (*Id.*).  The *Medium* article further noted that Mr. Mac had tweeted about Mr. Musk roughly 300 times at the time, often mocking his private as well as professional life, and pointing to various inaccuracies in Mr. Mac's reporting (which Mr. Mac then defended).  (*Id.*).

### E.     Mr. Musk's Efforts To Obtain Discovery From BuzzFeed

Two weeks following the publication of the September 4 BuzzFeed article, Mr. Unsworth sued Mr. Musk, alleging in part that the September 4 article was defamatory.  (Bolger Decl. Ex. W).  As to the BuzzFeed emails, the Complaint only claims that BuzzFeed's publication of the

1    statements was defamatory and does not assert any claim based on Mr. Musk's sending the

2    original emails to Mr. Mac.  (*Id.* ¶ 113).[2]

3            Mr. Musk initially issued a document subpoena to BuzzFeed in June 2019, seeking

4    production of certain BuzzFeed articles, any "internal policies, memoranda, or any other

5    documents concerning 'off the record' or 'on background' conversations or communications with

6    third parties," communications between BuzzFeed and Unsworth, communications between

7    BuzzFeed and Musk, and "documents concerning any payments, income, stipends, or gifts

8    [BuzzFeed] made or received for the August 28th Publication or the September 4th Publication."

9    (Bolger Decl. Ex. O).  BuzzFeed objected to the production request but agreed to produce copies

10   of the August 28 and September 4 publications and provided a link to the online copy of its News

11   Standards and Ethics Guide.  (Bolger Decl. Ex. P).  Mr. Musk issued a second document subpoena

12   to BuzzFeed in August 2019, specifically requesting, among other things, the version of the News

13   Standards and Ethics Guide in effect as of September 4, 2018, given that the News Standards

14   indicated they been updated in November 2018.  (Bolger Decl. Ex. Q).  Mr. Musk sought

15   "documents concerning [BuzzFeed's] policy for publication of 'off the record' or 'on background'

16   conversations or communications with third parties," BuzzFeed's standards for newsworthiness,

17   BuzzFeed's policies concerning libel and defamation, a copy of BuzzFeed's News Standards and

18   Ethics Guide as it existed on August 30, 2018 and on September 4, 2018, and documents related to

19   any changes to this Guide or to communications about conditions of "off the record" or "on

20   background" communications.  (Bolger Decl. Ex. Q.).   Mr. Musk also sought communications

21   sent externally by BuzzFeed regarding publication of the August 28 and September 4 publications

22   and the decision to publish Mr. Musk's emails—which would have encompassed any

23   communications with *The Atlantic* and the *Medium* journalists—and all documents produced in

24   response to Mr. Unsworth's July 29, 2018 subpoena.  (*Id.*).  BuzzFeed objected and produced only

25   the version of the News Standards in effect at the relevant time and the documents it had provided

26

27   _____

    [2]  Although Mr. Mac notes (Mot. at 10) that the Complaint "seeks damages for, among other

28   things, statements made by Musk and repeated by BuzzFeed," Mr. Mac ignores that the Complaint
     does not claim reputational harm from Mr. Musk's sending the emails to Mr. Mac.

1 to Mr. Unsworth, and documents showing web traffic to its page on dates articles about Mr. Musk

2 were published.  (Bolger Decl. Ex. R).  BuzzFeed did not produce any other requested documents.

3 (*Id.*).

4 　　　Mr. Musk then issued the deposition subpoena to Mr. Mac on August 26, 2019, noticing

5 his deposition for September 11, 2019.  (Bolger Decl. Ex. S).  The subpoena made clear that

6 "Mr. Musk does not intend to seek testimony … that would be protected by the United States

7 or California Constitutions or any other reporter's privilege."  (*Id.*).  Mr. Mac indicated he

8 would not appear and planned to file a motion to quash.  (Bolger Decl. Ex. U).  Mr. Musk

9 inquired as to whether Mr. Mac and BuzzFeed would consider converting the deposition to a Rule

10 30(b)(6) deposition and listed proposed topics:  (1) BuzzFeed's guidelines on publishing off-the-

11 record and on-background information; (2) BuzzFeed's prior publication of off-the-record and on-

12 background information; (3) BuzzFeed's pre-publication review process; (4) BuzzFeed's editorial

13 process, including determination of newsworthiness, conflict of interest, and publication of

14 original source documents; (5) BuzzFeed's guidelines on social media usage by reporters; (6) the

15 scope and existence of BuzzFeed's coverage of Elon Musk, Tesla, or SpaceX; (7) the scope and

16 existence of BuzzFeed's coverage of the Thai cave rescue; (8) BuzzFeed's procedures for

17 predicting article popularity; (9) BuzzFeed's policies for determining payment or bonuses based

18 on article popularity; (10) BuzzFeed's assessment of the likely popularity of articles involving the

19 Thai cave rescue; and (11) BuzzFeed's assessment of the likely popularity of articles involving

20 Elon Musk, Tesla, or SpaceX.  (*Id.*).  Mr. Mac rejected the offer to convert the deposition to a

21 Rule 30(b)(6) deposition without discussion.  (*Id.*).  Instead, he filed this motion to quash.

22 <u>**ARGUMENT**</u>

23 **I.    MR. MAC FAILS TO DEMONSTRATE THAT THE SHIELD LAW REQUIRES**

24 **QUASHING THE DEPOSITION SUBPOENA**

25 　　　**A.    The Shield Law Does Not Apply to a Motion to Quash.**

26 　　　At the threshold, and as Mr. Mac implicitly recognizes (Mot. at 17 n.11), his motion is

27 based on a statute that does not authorize a court to quash a subpoena.  Section 1070 of the

28 California Evidence Code and the California State Constitution, article I, section 2, provide that a

reporter "cannot be adjudged in **contempt** … for refusing to disclose, in any proceeding as defined

in Section 901, the source of any information procured while so connected or employed for

publication in a newspaper, magazine or other periodical publication, or for refusing to disclose

any unpublished information obtained or prepared in gathering, receiving or processing of

information for communication to the public."  Cal. Evid. Code § 1070; *see also* Cal. Const. art. I,

§ 2(b).  The California Supreme Court had held that "[a]llowing relief before a judgment of

contempt would violate the unambiguous language of the shield law."  *New York Times Co. v.*

*Superior Court*, 51 Cal. 3d 453, 459 (1990).

　　　　　　Contrary to Mr. Mac's assertion (Mot. at 17 n.11), it would not be "sensible" to ignore the

language of the statute.  Rather, such an argument asks this Court to disregard California Supreme

Court law interpreting the statute Mr. Mac invokes, which holds that "the shield law provides only

an immunity from *contempt*, *not a privilege*."  *New York Times Co.*, 51 Cal. 3d at 458 (emphasis

added).  In *New York Times Co. v. Superior Court*, a journalist sought a writ to be excused from

producing documents the trial court had ordered produced, before being held in contempt.  *Id.* at

457.  After the trial court ordered the production of unpublished photographs for in camera

inspection, the newspaper sought relief before the issuance of an order of contempt.  *Id.*  The

Supreme Court determined a "newsperson's petition for extraordinary relief is premature until a

judgment of contempt is entered."  *Id.* at 460.

　　　　　　Thus, contrary to Mr. Mac's repeated assertions, "there is nothing from which to seek

relief until a newsperson has been adjudged in contempt."  *Id.* at 459; *see also KSDO v. Superior*

*Court*, 136 Cal. App. 3d 375, 379–80 (1982) ("The California shield law, however, is unique in

that it affords only limited protection.  It does not create a privilege for newspeople, rather it

provides an immunity from being adjudged in contempt.  This rather basic distinction has been

misstated and apparently misunderstood by members of the news media and our courts as well.").

To hold otherwise would run afoul of the principle that "[t]he constitution is to be interpreted by

the language in which it is written, and courts are no more at liberty to add provisions to what is

therein declared in definite language than they are to disregard any of its express provisions."

*Delaney v. Superior Court*, 50 Cal. 3d 785, 799 (1990).

1   Mr. Mac's reliance on *L.A. Memorial Coliseum Commission v. NFL*, 89 F.R.D. 489 (C.D.

2   Cal. 1981), does not require this Court to disregard the California Supreme Court's interpretation

3   of the Shield Law. To start, *L.A. Memorial Coliseum* pre-dates the rule the California Supreme

4   Court established in *New York Times Co. v. Superior Court*. Further, in *L.A. Memorial Coliseum*,

5   the discovery concerned *only* specific information (notes and memorandum) within the scope of

6   the statute. 89 F.R.D. at 491-92. Thus, even if in that case a ruling on the Shield Law might have

7   been appropriate, here Mr. Musk has identified subjects that fall outside the scope of the statute.

8   For this reason, it is Mr. Mac—not Mr. Musk—who is preventing the "just, speedy and

9   inexpensive" administration of justice, Fed. R. Civ. P. 1, by filing a motion seeking a ruling on an

10   issue that has not even ripened.[3]

11   **B.     The Shield Law Does Not Cover the Testimony Sought Here.**

12   If this Court considers the merits of Mr. Mac's motion, it should reject his argument that

13   the California Shield Law "absolutely prohibits" enforcement of the deposition subpoena. The

14   Shield Law is targeted at protecting the integrity of the newsgathering process and does not

15   implicate a wide-range of topics relevant to the underlying case here.

16   Federal Rule of Civil Procedure 26(b) allows a party to obtain discovery concerning any

17   non-privileged matter that is relevant to any party's claim or defense. Fed. R. Civ. P. 26(b)(1).

18   "Traditionally, the relevance requirement of Rule 26(b)(1) has been construed broadly." *Wit v.*

19   *United Behavioral Health*, 2016 WL 258604, at *10 (N.D. Cal. Jan. 21, 2016) (citing

20   *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) ("The key phrase in this

21   definition— 'relevant to the subject matter involved in the pending action'—has been construed

22

23

24   [3] *Hurry v. Fin. Industry Regulatory Auth., Inc.*, 2017 WL 3701955 (N.D. Cal. Apr. 7, 2017) (cited at Mot. 17 n.11), does not discuss the scope of the California Shield Law but, in any event,

25   offers no facts analogous to the facts present here. There, the plaintiffs sought to ask specific questions within the scope of the Shield Law and the plaintiffs rejected a compromise for

26   testimony "about general editorial practices" or answers to written questions. *Id.* at *2. Here, Musk identified numerous topics not covered by the Shield Law, including general editorial

27   practices. Even then, the *Hurry* court permitted the plaintiffs "to propound written discovery that is not geared toward privileged information." *Id.*

28

1  broadly to encompass any matter that bears on, or that reasonably could lead to other matter that

2  could bear on, any issue that is or may be in the case.")).

3       Although the protections of the California Shield Law against compelled disclosure have

4  been described as "absolute," the specific material protected is limited in scope.  Cal. Evid. Code

5  § 1070.  In general, the Shield Law "protects a newsperson from being adjudged in contempt for

6  refusing to disclose either: (1) unpublished information, or (2) the source of information, whether

7  published or unpublished."  *Delaney*, 50 Cal. 3d at 797.[4]  The reporter shield law thus only

8  "extends to any unpublished information obtained or prepared in gathering, receiving, or

9  processing of information for communication to the public."  *Rancho Publications v. Superior*

10  *Court*, 68 Cal. App. 4th 1538, 1544 (1999).  "The shield law provides no protection for

11  information obtained by a journalist not directly engaged in 'gathering, receiving or processing'

12  news."  *Delaney*, 50 Cal. 3d at 797 n. 8.

13       As an initial matter, the information Mr. Musk seeks is undoubtedly relevant to issues in

14  this case.  The defamation action concerns Mr. Mac and BuzzFeed News's republication of

15  information in Mr. Musk's emails.  Mr. Musk has raised issues concerning whether it was not

16  reasonably foreseeable that BuzzFeed News would republish the emails, which had been marked

17  as "off the record" and "on background."  BuzzFeed News had standards for sourcing articles,

18  assessing the newsworthiness of topics, and ensuring that BuzzFeed News does not publish

19  defamatory content.  (Bolger Decl. Ex. P.)  Notably, BuzzFeed News changed those standards—

20  which did not speak to the question of off-the-record agreements—after it republished Mr. Musk's

21  comments.  Mr. Mac's understanding of the BuzzFeed policies on sourcing and pre-publication

22  review, BuzzFeed News's reason for modifying its standards to specify that a reporter must agree

23  to go off-the-record, prior instances in which Mr. Mac published information and identified an off-

24  the-record source, and the process for reporting and publishing articles are all relevant to the

25  question of whether BuzzFeed News's republication of Mr. Musk's emails was foreseeable.

26

27       [4]  "Data" specifically refers to "physical source items of the same general nature as the
particular source items enumerated" in the statute.  *Playboy Enterprises, Inc. v. Superior Court*,
28  154 Cal. App. 3d 14, 22 (1984).

1    Thus, Mr. Musk has demonstrated that a deposition of Mr. Mac is likely to lead to relevant

2    information.  *Wit*, 2016 WL 258604, at *10.

3         Nor is such information subject to any applicable privilege.  *First*, as discussed above, the

4    California Shield Law is not a privilege.  *KSDO*, 136 Cal. App. 3d at 379 ("The description 'shield

5    law' conjures up visions of broad protection and sweeping privilege.  The California shield law,

6    however, is unique in that it affords only limited protection.  It does not create a privilege for

7    newspeople, rather it provides an immunity from being adjudged in contempt.").

8         *Second*, the information Mr. Musk seeks does not require Mr. Mac to disclose the "source

9    of any information procured" or "any unpublished information obtained or prepared in gathering,

10   receiving or processing of information for communication to the public."  Cal. Evid. Code § 1070.

11   Instead, Mr. Musk seeks testimony on generally applicable standards and policies and Mr. Mac's

12   general practices.  This is particularly true as to the basis for modifying BuzzFeed's guidelines

13   after the publication of the September 4, 2018 article to specifically state that "[i]nterviews are

14   always on the record until a reporter agrees to go off the record or on background."  (Bolger Decl.

15   Ex. I, p. 3.)  Nor are questions concerning the mere existence of published information—for

16   instance, prior instances in which BuzzFeed has published off-the-record source—subject to the

17   Shield Law.  Mr. Musk is entitled to explore these general topics with Mr. Mac or another person

18   knowledgeable about them.[5]  Any argument that such topics fall within the scope of the Shield

19

20   [5]  Mr. Mac argues in a footnote that a qualified First Amendment privilege requires quashing the
     deposition subpoena.  (Mot. at 17 n.12.)  But he recognizes that such a privilege is limited to

21   disclosure of "unpublished information relating to his newsgathering" and "the identity of
     confidential sources and of unpublished information supplied by such sources."  (*Id.* (citing

22   *Mitchell v. Superior Court*, 37 Cal. 3d 268 (1984))).  Even if this standard applies here (which,
     given that Mr. Musk does not seek information covered by the privilege, and that Mr. Mac

23   ironically seeks to invoke the privilege despite his voluntary disclosure of Mr. Musk as the off-
     the-record source, it does not), the factors favor Mr. Musk.  *First*, while Mr. Mac is a non-party,

24   Mr. Unsworth has sued Mr. Musk only for BuzzFeed's republication of information in off-the-
     record emails, not any prior or subsequent publication.  *Second*, because the "heart" of Mr.

25   Unsworth's claim is that the BuzzFeed publication damages Mr. Unsworth's reputation, testimony
     on BuzzFeed's guidelines and standards is central to Mr. Musk's defense, including not only

26   whether it was reasonably foreseeable that BuzzFeed would publish the email but also whether
     BuzzFeed would publish unsubstantiated allegations or had processes to prevent that.  *Finally*,

27

28   while Mr. Mac baselessly asserts that Mr. Musk can obtain such information elsewhere, Mr. Mac

Law is not only contradicted by the statute's plain language but undermined by the statements Mr.

Mac made to *The Atlantic* reporter and *Medium* journalist on these very topics.  (Schwartz Decl.

Ex. 19; Bolger Decl. Ex. J.)

*Third*, Mr. Mac's argument in support of quashing the subpoena rests upon a red

herring—that the deposition subpoena necessarily requires Mac to reveal "'unpublished

information' relating to the newsgathering process."  Mot. at 13 (citing Cal. Const. art. I, § 2(b),

Cal. Evid. Code § 1070).  Such an argument contradicts the fact that Mr. Musk was—and

remains—willing to convert the Mac deposition subpoena to a subpoena for a Rule 30(b)(6)

deposition of a BuzzFeed News representative.  Although Mr. Mac asserts that the proposed Rule

30(b)(6) topics "amounted to a fishing expedition into BuzzFeed's editorial practices," that are

"irrelevant to the Defamation Action, grossly overbroad and would invariably require BuzzFeed to

reveal privileged information about its newsgathering activities," (Mot. at 12 n.8), Mr. Mac has

not explained—during the meet-and-confer process or in his motion—how inquiry into BuzzFeed

News's general policies would reveal privileged information.  Such a blanket assertion

demonstrates that Mr. Mac does not seek to protect the integrity of the newsgathering process but

rather seeks immunity from testifying.

*Finally*, none of the cases Mr. Mac cites supports quashing the subpoena here, as each case

concerns requests for discovery falling squarely within the scope of the immunity.  For

example, *L.A. Memorial Coliseum Commission v. NFL*, concerned a subpoena seeking reporters'

notes that would have "force[d] disclosure of information given to them in confidence as well as

the identities of their sources."  89 F.R.D. at 491.  And, far from seeking information relevant to a

claim and defense, as Mr. Musk seeks here, the NFL subpoenaed the reporters not for information

relevant to the defense of the underlying claims but rather to support a motion for a venue change

due to pre-trial publicity.  *Id.*  In *New York Times Co. v. Superior Court*, an automobile

manufacturer sought discovery of unpublished photographs in the possession of the newspaper of

points to no information that speaks to BuzzFeed News's implementation of its policies and
practices.  Precisely because Mr. Musk does not seek information regarding the facts underlying
the BuzzFeed News article, Mr. Musk cannot obtain such information from anyone else.

1  an accident that led to a products liability suit against the manufacturer.  51 Cal. 3d at 455.  And,

2  in *Playboy Enterprises*, *Inc. v. Superior Court*, the court simply rejected an attempt by defendants

3  in a civil fraud case to obtain all records, notes, and source materials from an interview of the

4  plaintiffs to support a defense and impeach the plaintiff's credibility.  154 Cal. App. 3d at 27.

5  Similarly, *Miller v. Superior Court*, 21 Cal. 4th 883 (1999), holds only that a newsperson could

6  not held be in contempt for refusing to produce unaired portions of a videotaped interview with a

7  defendant charged with murder.  *Id.* at 887; *see also Baker v. Goldman Sachs & Co.*, 669 F.3d 105

8  (2d. Cir. 2012) (affirming order quashing deposition subpoena of reporter when plaintiff sought

9  information on the sourcing and accuracy of articles regarding the earnings and stock valuation of

10  a company); *Giuffre v. Maxwell*, 221 F. Supp. 3d 472 (S.D.N.Y. 2016) (quashing subpoena

11  seeking communications between journalist and source).

12      In contrast to the relevant information Mr. Musk seeks here, which does not require

13  delving into Mr. Mac's reporting for the September 4 article, the requests in each of the cases

14  upon which Mr. Mac relies seek a journalist's work product and have no application here.  In fact,

15  in *Playboy Enterprises*, the court held that the petitioner's refusal to disclose the address and

16  whereabouts of one of its freelance writers was improper.  154 Cal. App. 3d at 29.

17      **C.**    **Mr. Mac Waived Any Protection of the Shield Law.**

18      Even if this Court determines that a deposition of Mr. Mac would encompass only

19  protected subjects, Mr. Mac has waived any protection of the Shield Law.

20      As Mr. Mac's own case recognizes, a reporter may waive the protections of a shield law by

21  voluntarily disclosing the information sought.  *Baez v. JetBlue Airways*, 2012 WL 5471229, at *2

22  (E.D.N.Y. Nov. 9, 2012) (cited at Mot. at 20) (holding reporter waived application of New York

23  Shield law by submitting a sworn declaration revealing the sources for his article but quashing

24  subpoena because plaintiff sought no relevant information); *see also Ayala v. Ayers*, 668 F. Supp.

25  2d 1248, 1250 (S.D. Cal. 2009) ("[L]ike other privileges, it appears that the journalist's privilege

26  may be waived."); *In re Venezia*, 191 N.J. 259, 262 (2007) (holding protection of shield law may

27  be "waived when a reporter knowingly discloses information in circumstances unrelated to the

28  news reporting and gathering process"); *Pinkard v. Johnson,* 118 F.R.D. 517, 523 (M.D. Ala.

1   1987) (newspaper reporter waived qualified reporter's privilege with respect to a certain

2   conversation he had with the defendant because he had already provided a signed affidavit about

3   the conversation to plaintiff's counsel).  "The manifested legislative intent [of the California

4   Shield Law] is to give broad protection to both information and source material *so long as such*

5   *matter has not been already disseminated by the person from whom disclosure is sought*, even if

6   related or derivative information has been disseminated by such publication."  *Playboy*

7   *Enterprises*, 154 Cal. App. 3d at 22 (emphasis added).   To prevent the selective disclosure of

8   information covered by the Shield Law, such protection may be waived by public disclosure even

9   if not waived through publication.  *See News-Journal Corp. v. Carson*, 741 So. 2d 572, 574 (Fla.

10  Dist. Ct. App. 1999) ("Although the statute provides that publication or broadcasting the

11  information does not waive the privilege, the act of filing a document in the public records is a

12  different matter.").

13          Following publication of the September 4, 2018 BuzzFeed article, Mr. Mac communicated

14  with another news organization and a freelance journalist about his decision to publish Mr. Musk's

15  emails, including Mr. Mac's interpretation of the meaning of off-the-record and his assessment of

16  the newsworthiness of the article.  (Schwartz Decl. Ex 19.)  This "[d]isclosure of information …

17  by [Mr. Mac] outside of the newsgathering and news reporting process constitutes a waiver of the

18  privilege."  *In re Venezia*, 191 N.J. at 271.  Thus, "[i]n the interests of fairness," Mr. Mac should

19  not be able to assert the Shield Law applies to these topics in the underlying litigation when he

20  spoke freely and publicly about the subject to individuals outside BuzzFeed News.  *Ayala*, 668 F.

21  Supp. 2d at 1250 ("[A] journalist/author should not be permitted to disclose information to

22  advance the interests of one litigant and then invoke the journalist's privilege to prevent discovery

23  of this same information by another litigant."); *see also Lozman v. City of Riviera Beach*, 2014

24  WL 12360697, at *4-5 (S.D. Fla. Oct. 8, 2014) (holding prior testimony effected waiver of

25  journalist's privilege); *Guice-Mills v. Forbes*, 819 N.Y.S.2d 432, 436 (N.Y. Sup. Ct. 2006)

26  (holding under New York shield law that journalist waived protection of the shield law upon a

27  decision to "voluntarily disclose or consent to disclosure 'of the specific information sought to be

28  disclosed to any person not otherwise entitled to claim the exemptions provided by this section'").

Mr. Mac publicly addressed the newsworthiness of and decision to publish Mr. Musk's emails labeled "off the record" and "on background" and therefore Mr. Mac cannot now claim the protections of the Shield Law, even if it otherwise would apply to such topics.

## II.   MR. MAC FAILS TO DEMONSTRATE THAT THE DEPOSITION SUBPOENA IS UNDULY BURDENSOME OR HARASSMENT

This Court also should reject Mr. Mac's independent argument that the subpoena should be quashed because it is unduly burdensome and intended to harass.  The information sought is plainly relevant to the underlying defamation action and thus Mr. Mac has failed to carry his burden to show the subpoena should be quashed.

*First*, contrary to Mr. Mac's contention (Mot. at 17), as demonstrated *supra*, the information Mr. Musk seeks is relevant to his defense of the defamation action.  To start, Mr. Mac wrongly frames the discovery Mr. Musk seeks as "Mac's subjective impressions" as to the reasonable foreseeability that BuzzFeed would publish Mr. Musk's email.  Mot. at 19.  But Mr. Musk identified in correspondence with Mr. Mac's counsel numerous topics unrelated to Mr. Mac's subjective impression that are relevant to this inquiry.  For instance, Mr. Mac's process for developing sources on his beat, Mr. Mac's general understanding of the BuzzFeed policies on sourcing and pre-publication review, BuzzFeed's reasoning for modifying their News Standards to specify that a reporter must agree to go off-the-record, the existence of prior instances in which Mr. Mac published information and identified an off-the-record source, and the general process for reporting and publishing articles are all relevant to the question of whether BuzzFeed's republication of Mr. Musk's emails were foreseeable.  Such topics do not implicate Mr. Mac's "subjective impression" and instead elicit relevant information without delving into Mr. Mac's specific reporting of the September 4 BuzzFeed article.  For this reason, Mr. Mac's argument that the case law does not "consider the state of mind of the secondary publisher (*i.e.*, Mac)," has no bearing on whether Mr. Musk seeks relevant information by deposing Mr. Mac.  And, in any event, the information Mr. Musk seeks is relevant.  *See, e.g.*, *Mitchell*, 37 Cal. 3d at 282 (requiring plaintiff to "show a sufficient causal link" to establish liability).

1    Neither *Baez v. JetBlue Airways*, 2012 WL 5471229 (E.D.N.Y. Nov. 9, 2012) nor *Hurry v.*

2  *Fin. Industry Regulatory Auth., Inc.*, 2017 WL 3701955 (N.D. Cal. Apr. 7, 2017), support a

3  contrary conclusion.  In *Baez*, the plaintiff had been criminally charged with making a false bomb

4  threat and alleged that JetBlue defamed her by providing false and misleading information about

5  the incident to news agencies and media outlets.  2012 WL 5471229 at *1.  But the subpoenaed

6  reporter there submitted a sworn declaration stating that he had never spoken with any JetBlue

7  representative for his story.  *Id.*  Only because the declaration negated the possibility of the

8  plaintiff obtaining relevant information did the court grant the motion to quash.  *Id.* at *2.

9    Likewise, in *Hurry*, the court quashed the subpoena because the only potentially relevant

10  information the plaintiffs seeking to depose the reporter had identified fell squarely within the

11  protection of the Shield Law.  2017 WL 3701955 at *1-2.  Even then, the *Hurry* court permitted

12  the plaintiffs "to propound written discovery that is not geared toward privileged information."  *Id.*

13  at *2.  By contrast, Mr. Musk has identified information that goes squarely to the question of his

14  liability for defamation that is not covered by the Shield Law.

15    *Second*, Mr. Mac errs in contending that "the parties have no need to depose Mac because

16  they already have all the evidence they need to determine whether BuzzFeed's republication of

17  Musk's emails were reasonably foreseeable."  Mot. at 20.  As an initial matter, the relevant topics

18  are not limited to reasonable foreseeability, but also include safeguards that BuzzFeed News

19  employs to ensure that they do not publish defamatory articles.   Beyond that, however, Mr. Musk

20  is entitled to ask about the change in the BuzzFeed News Standards and about Mr. Mac's

21  compliance as a general matter with those guidelines.  Even were Mr. Musk to "engage an expert

22  in order to back up his claims" on treatment of off-the-record requests, as BuzzFeed suggests

23  (Mot. at 20-21), expert testimony must be based on facts and thus Mr. Musk is entitled to obtain

24  information on BuzzFeed's and Mr. Mac's journalistic practices.

25    *Finally*, contrary to Mr. Mac's unsupported argument, the deposition subpoena is not an

26  attempt to annoy or harass Mr. Mac.  "The burden of persuasion in a motion to quash a subpoena

27  issued in the course of civil litigation is borne by the movant."  *In re Ex Parte Apple Inc.*, 2012

28  WL 1570043, at *1 (N.D. Cal. May 2, 2012).  Mr. Mac has no support for his claim that Mr. Musk

1   issued this subpoena in bad faith, other than vague speculation that Mr. Musk is occasionally rude

2   to journalists.  Such an argument ignores that the subject matter of the deposition is highly

3   relevant to Mr. Musk's defense and Mr. Musk has a legitimate reason for seeking such

4   information.  In addition, Mr. Musk specifically offered to convert the Mac deposition to a Rule

5   30(b)(6) deposition, which would allow BuzzFeed to present for deposition any employee

6   educated about the proposed topics, and belies any claim that Mr. Musk seeks to harass Mr. Mac.

7   *See* Fed. R. Civ. P. 30(b)(6) (allowing organization to "designate one or more officers, directors,

8   or managing agents, or designate other persons who consent to testify on its behalf").  Thus, it is

9   simply not the case Mr. Musk seeks to "put Mac through the ordeal of a hostile deposition for no

10  reason other than to retaliate against Mac."  Mot. at 22.

11         At most, should this Court determine that Mr. Mac has established "that specific harm or

12  prejudice will result," *J2 Glob. Commc'ns, Inc*, 2009 WL 10671967, at *4 (C.D. Cal. June 24,

13  2009), it may issue a protective order narrowing the scope of the deposition rather than quashing

14  the subpoena in its entirety.  *See id.*; *see also Polaris Innovations Ltd. v. Kingston Tech. Co., Inc*.,

15  2017 WL 2806897, at *4 (C.D. Cal. Mar. 30, 2017) ("To issue protective orders over discovery

16  materials, courts must find good cause."); Fed. R. Civ. P. 26(c)(1) (court may, "for good cause,

17  issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue

18  burden or expense").[6]

19         Mr. Mac's reliance (Mot. at 21-22) on the principle that journalists should not be subject

20  to invasive discovery is likewise misplaced.  As Mr. Mac's own cases recognize, harassment

21  occurs when discovery is "not being conducted in good faith" or if the "newsman is called upon to

22  give information bearing only a remote and tenuous relationship to the subject of the

23  investigation." *Branzburg v. Hayes*, 408 U.S. 665, 710 (1972) (Powel, J., concurring).  The

24  information Mr. Musk seeks to elicit from Mr. Mac is not irrelevant, nor is the scope of the

25  subpoena "needlessly intrusive."  Mot. at 22.  A single deposition of a BuzzFeed News

26

27  _____

[6]  Alternatively, the Court could appoint a discovery referee to ensure Mr. Mac does not

28  experience any harassment or questioning on topics covered by the Shield Law.  *See* N.D. Cal.
ADR Local Rule 8-1(c).

1  representative (Mr. Mac or otherwise) that does not seek information covered by the Shield Law

2  cannot reasonably be classified as "unreasonable and oppressive." *Los Angeles Mem'l Coliseum*

3  *Comm'n*, 89 F.R.D. at 496.

4      None of the cases upon which Mr. Mac relies requires a contrary result because, unlike the

5  discovery sought here, the subpoenas in those cases failed to identify any relevant information.

6  *See id.* (quashing subpoena seeking to "interrogate [reporters] as to their confidential sources or to

7  rummage through their notes of confidential conversations"); *Baez*, 2017 WL 5471229, at *2

8  (quashing subpoena seeking information on unpublished conversation with suspected source

9  following reporter's sworn declaration that he did not speak to the suspected source); *Shoen v.*

10 *Shoen*, 5 F.3d 1289, 1297-98 (9th Cir. 1993) (holding plaintiffs could not establish compelling

11 reason to overcome journalist privilege because plaintiffs had failed to depose the known source of

12 the reporter's book).

13                          **<u>CONCLUSION</u>**

14      For the foregoing reasons, the Court should deny the motion to quash.

15

16   DATED:  September 27, 2019                QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP
17

18

19                                             <u>         /s/ Alex Spiro         </u>
                                               Alex Spiro
20
                                               51 Madison Avenue, 22nd Floor
21                                             New York, New York 10010
                                               Telephone: (212) 849-7000
22

23                                             *Counsel for Defendant Elon Musk*

24

25

26

27

28

**<u>ATTESTATION</u>**

1

2      I, Robert Schwartz, am the ECF User whose ID and password are being used to file this

3 Opposition to Motion of Non-Party Ryan Mac to Quash the Deposition Subpoena.  In compliance

4 with Civil Local Rule 5-1(i)(3), I hereby attest that Alex Spiro has concurred in this filing.

5

6  DATED:  September 27, 2019               QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP

7

8

9                                       */s/ Robert M. Schwartz*
                                 Robert M. Schwartz