1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3   Before Honorable Jacqueline Scott Corley, Magistrate Judge

4

5   UNSWORTH,                        )
                                     )
6            Plaintiff,              )
                                     )
7   vs.                              )     No. 19MC80224-JSC
                                     )
8   MUSK,                            )
                                     )
9            Defendant.              )
    ─────────────────────────────────)

10

                                     San Francisco, California
11                                   Thursday, October 17, 2019

12

    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13            RECORDING 9:03 - 9:43 = 40 MINUTES

14

    APPEARANCES:
15

    For Plaintiff:
16
                              L. Lin Wood, P.C.
17                            1180 West Peachtree Street, NW
                              Suite 2040
                              Atlanta, Georgia 30309
18                       BY:  G. TAYLOR WILSON, ESQ.

19  For Defendant:

20                            Quinn, Emanuel, Urquhart
                                & Sullivan, LLP
21                            51 Madison Avenue
                              Twenty-Second Floor
22                            New York, New York 10010
                         BY:  ALEXANDER B. SPIRO, ESQ.
23

24
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
25

2

```
 1 | APPEARANCES:   (Cont'd.)
 2 | For Ryan Mac:
                              David, Wright, Tremaine, LLP
 3 |                          1251 Avenue of the Americas
                              Twenty-First Floor
 4 |                          New York, New York 10020
                     BY:   KATHERINE M. BOLGER, ESQ.
 5 |
                              Davis, Wright, Tremaine, LLP
 6 |                          505 Montgomery Street
                              Suite 800
 7 |                          San Francisco, California
                               94111
 8 |                     BY:   THOMAS R. BURKE, ESQ.
 9 |
    | Transcribed by:          Echo Reporting, Inc.
10 |                          Contracted Court Reporter/
                              Transcriber
11 |                          echoreporting@yahoo.com
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
```

3

1 <u>Thursday, October 17, 2019</u>                          <u>9:03 a.m.</u>

2                     P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4          THE CLERK:  Calling civil action 19MC80224,

5 Unsworth versus Musk.

6      Counsel, please state your appearance.

7          MR. SPIRO:  On behalf of Mr. Musk, Alex Spiro.

8          THE COURT:  Good morning.

9          MR. WILSON:  Good morning, your Honor.  On behalf

10 of Mr. Vernon Unsworth, Taylor Wilson.

11          THE COURT:  Good morning.

12          MS. BOLGER:  Good morning, your Honor.  On behalf

13 of Ryan Mac, investigative reporter, Katherine Bolger.  And

14 with me is my partner, Tom Burke.

15          THE COURT:  Good morning.

16      All right.  Mr. Spiro I understand has a leg injury, so

17 we're going to -- so it will be equal, we'll have everyone

18 just stay at counsel tables.

19          MR. SPIRO:  I appreciate that.

20          THE COURT:  It's a reasonable accommodation.

21          MR. SPIRO:  Thank you.

22          THE COURT:  That doesn't apply to the other cases.

23      All right.  So -- here let me sort of -- this is what I

24 need to figure out, but let me tell you sort of what my

25 analysis is.

4

1      With respect to the California Journalist Privilege, it
2 is in fact a privilege just from contempt.  However, were I
3 to order a reporter to answer questions, which fall within
4 the privilege, the reporter would just refuse the answer and
5 then I couldn't find him in contempt, because the privilege
6 would apply.  Therefore, to issue such an order would be
7 unduly burdensome and I wouldn't do it.  So even though I
8 agree, it is just a privilege from contempt, in the case of
9 a Rule 45 subpoena, I think it's irrelevant.
10     That being said, the question is whether the
11 information being sought even falls within the privilege at
12 all.  And so that's what -- I need to know what's being
13 sought.
14          MR. SPIRO:  Sure, Judge.  And I appreciate you
15 framing it that way, because it's our position that what is
16 being sought and the questions that I would seek to ask Mr.
17 Mac do not fall within the privilege.
18     Just to get right to the point, this defamation action
19 is based not on an email that Mr. Musk sent to Mr. Mac.
20 It's not based on Mr. Mac's sourcing or confidential
21 information of his article.  It's based on Mr. Mac's article
22 and that publication to the world.
23          THE COURT:  Isn't it also based on a number of
24 tweets?
25          MR. SPIRO:  Well those issues that happened months

5

1   earlier are a different part of the case.

2          THE COURT:  But they're part of the -- I mean I

3   read the summary judgment motion.

4          MR. SPIRO:  They are part of the case.

5          THE COURT:  They make up most of the briefing.

6          MR. SPIRO:  They make up -- perhaps.  But it's our

7   position, and if the Court wants I can address that, those

8   are tweets that occur sort of in real time in response to

9   what Mr. Unsworth said about Mr. Musk.  They were

10  responsive.  They were deleted and apologized for.  And

11  that's sort of ended this matter, until again, the BuzzFeed

12  article that sort of has become center stage in the

13  defamation case.

14     So again, the reality is that the defamation actually

15  in at least a large part is based on the BuzzFeed

16  publication.

17         THE COURT:  I don't know why that matters.  The

18  question is, is what you're seeking relevant to the case?

19         MR. SPIRO:  Sure.

20         THE COURT:  It's the Plaintiff's -- Mr. Mac's

21  (sic) case.  He made his defamation claims.  You may have

22  defense to them.  You may argue that those tweets were in

23  response to something he said and he apologized and

24  therefore, so what?  This question -- the question here

25  today is whether it's relevant to whether the publication by

6

1 BuzzFeed of those emails was reasonably foreseeable to Mr.

2 Musk.  That's what I understand.

3          MR. SPIRO:  Exactly.  That's --

4          THE COURT:  Okay.

5          MR. SPIRO:  That is exactly the issue.

6          THE COURT:  Whether it's a big part of the case,

7 or small part of the case, it's part of the case.

8          MR. SPIRO:  And it's our position that the -- Mr.

9 Musk has rights, has rights to discovery, he has rights to a

10 fair trial and the questions that we're asking of Mr. Mac do

11 not have to do with the sourcing or this specific article,

12 but rather with BuzzFeed's standards and protocols.

13          THE COURT:  Okay, so how -- so just ask me, what

14 is the question?

15          MR. SPIRO:  You want the hypothetical question?

16          THE COURT:  Well it's not hypothetical in the

17 sense that you have to make a proffer to me of what --

18          MR. SPIRO:  I understand.

19          THE COURT:  -- you're going to ask him, right?

20          MR. SPIRO:  Understood.  So we would ask him,

21 "What is -- what are BuzzFeed's standards and policies?"

22          THE COURT:  When?

23          MR. SPIRO:  "At the time that you interacted with

24 Mr. Musk regarding this article."

25          THE COURT:  And standards and policies regarding

7

1 what?

2     MR. SPIRO:  Off the record, on background, whether

3 there needs to be an agreement, what the ethical obligations

4 are.  His background, his --

5     THE COURT:  Whose background?

6     MR. SPIRO:  Mr. Mac's.  Where else he worked.

7 What those standards were.  How he interpreted those

8 standards --

9     THE COURT:  Okay.

10     MR. SPIRO:  -- regarding the same issues.  "Did

11 BuzzFeed in fact, after the publication, change their

12 standards and policies?  Why did they change their standards

13 and policies?"  Questions along those lines.

14     THE COURT:  Okay.  All right.  So how is that

15 relevant to whether it was reasonably foreseeable to Mr.

16 Musk?

17     MR. SPIRO:  Right.  So we don't have a ruling from

18 the Court on whether it's a subjective or objective standard

19 as to reasonable foreseeability, but of course our opponent

20 in the case has questioned already Mr. Musk's credibility on

21 this issue of whether or not he thought it was reasonably

22 foreseeable.

23     So in all reasonable foreseeable situations, where you

24 think of products liability, or really anything, the

25 question is, what other objective indicia are there that you

8

1   can show a jury and show a fact find to determine whether

2   form his position what he's doing is reasonably foreseeable.

3          THE COURT:  Sure.  And Mr. Musk, I'm sure, has a

4   long history of speaking to reporters and journalists, and

5   he can testify to that as to what his experience is.  You'll

6   have an expert who will survey the industry and say what the

7   practice of the industry is, right?  But I guess in one way,

8   I don't even know why it matters.

9      Let's say BuzzFeed's policy was that we don't actually

10  -- if -- we view it public, unless we have an agreement in

11  advance.  You're not going to tell me if that was their

12  policy.  You're going to concede then that it was reasonable

13  foreseeable to Mr. Musk that the email would be published.

14  Because you would say, "That wasn't his understanding, based

15  on his experience."

16     So I don't know why the converse then would be

17  relevant.

18          MR. SPIRO:  Well it's a difference between

19  conceding and relevant.  I would say that absolutely what

20  the Court just said is relevant, and the opposite is

21  relevant.  It's not about conceding an issue or not.  It's

22  the fact that Mr. Musk has the opportunity, through

23  discovery, to find relevant evidence to try to prove the

24  position that whether or not what he's doing is reasonably

25  foreseeable.  And he has a right to take objective indicia

9

1  of -- if BuzzFeed's policy, hypothetically said, "You don't

2  need an agreement.  If you say off the record, it means off

3  the record."  That would be very relevant evidence.

4          THE COURT:   Why?  What is every other journalist

5  publication in the country had the opposite policy?

6          MR. SPIRO:  It would be a -- it would still be

7  relevant if --

8          THE COURT:  Why?  He had no knowledge of it

9  whatsoever, so how could it even -- how could it even be

10 relevant?  I guess.  I mean I understand whether it's

11 subjective or objective, it still has to be objective based

12 on the facts known to Mr. Musk.  It can't be an objective

13 test based on facts of which he had no knowledge of or no

14 possible ability to have knowledge of.  It can't be -- it

15 can't be, "Well this was their policy and even though it was

16 secret and no one in the world knew about it, he -- it

17 should be reasonable foreseeable."

18     I mean I read the cases.  They don't really say one way

19 or the other.  Your summary judgment motion only cites one

20 in the two paragraphs in the entire motion that addressed

21 this issue, Chandler, that was it, which was from the -- DC.

22 It wasn't even a -- aren't we dealing with California Law

23 here?

24          MR. SPIRO:  Right.  But this is an issue that's

25 not as well explored and you have to look to cases in other

10

1 places.

2       But I will say that the reasonable person standard can

3 of course look to standards, and we do this all the time, in

4 negligence law and what were their standards, what would a

5 reasonable -- what was reasonably foreseeable to a

6 reasonable person?  If it's objective.

7       The other thing to remember, Judge, is Mr. Musk and his

8 companies have a history of dealing with BuzzFeed.

9             THE COURT:  Okay.

10            MR. SPIRO:  So what their policies and standards

11 are, and whether he expected a divergence from them, and

12 what Mr. Mac's position is on that, regarding those

13 standards, is relevant.

14            THE COURT:  Well that matters then what Mr. --

15 what Mr. Mac's (sic) position is, I guess.  Right?  So that

16 -- and actually maybe I should have started here with Mr.

17 Mac instead, because I agree with that, because fairness --

18 so actually, I'm going to stop.

19            MR. SPIRO:  Okay.

20            THE COURT:  And let's go to Mr. Mac (sic) and say,

21 what is it -- you already took Mr. Musk's deposition, right?

22            MR. WILSON:  That's true, your Honor.  And I

23 represent the Plaintiff, Vernon Unsworth.

24            THE COURT:  Oh, no, no.  Right.  Sorry, Mr.

25 Unsworth, that's what I meant.  I need to start with Mr.

11

1  Unsworth.

2           MR. WILSON:  Sure.

3           THE COURT:  Yes.  So you took -- so presumably you

4  authenticated those emails through Mr. Musk's deposition?

5           MR. WILSON:  We have, your Honor.

6           THE COURT:  Okay.  So you don't need Mr. Mac's

7  deposition for that?

8           MR. WILSON:  We do not need them to authenticate

9  the emails, that's correct.

10          THE COURT:  Okay.  So what do you need?

11          MR. WILSON:  I think at this point there's really

12 no dispute between Mr. Mac and Mr. Unsworth if the

13 information we're seeking does not fall within the

14 privilege.

15          THE COURT:  Okay.  But what is it that you need?

16          MR. WILSON:  We would like Mr. Mac to testify at a

17 -- in a way that would make admissible at trial the simple

18 facts that he has established in his declaration.

19    The most significant of which is that there has been no

20 history of correspondence between Mr. Mac and Mr. Musk and

21 that there was no correspondence other than the emails at

22 issue during which they could have established any off the

23 record agreement.

24          THE COURT:  Okay.  And presumably Mr. Musk

25 testified to that?

1          MR. WILSON:  Mr. Musk testified that there was no

2  preexisting off the record agreement.  He did testify to

3  that.  But the Plaintiff should not be required to present

4  solely the testimony of an adverse and hostile witness at

5  trial to the jury.  These are -- it's a very simple, short

6  deposition of Mr. Mac for the purposes of trial, not for

7  discovery, to present to the jury and the court another

8  viewpoint, besides the Defendant's, where he'll have an

9  opportunity to testify however he wishes in order to muddy

10 the waters.  It's a simple question of Mr. Mac.

11         THE COURT:  And so that would be that the only

12 communications they've ever had were in those emails, which

13 are in the record?

14         MR. WILSON:  Correct and that there was no

15 preexisting prior agreement that the emails would be off the

16 record.

17         THE COURT:  Well if there were no other

18 communications, it follows from that there are no -- there

19 was no prior agreement.

20         MR. WILSON:  Agreed, your Honor.

21         THE COURT:  Okay.  All right.  So let me ask then,

22 why -- I mean Mr. Mack is a percipient witness, like it or

23 not, right?  Certainly if he had had phone conversations

24 with Mr. Musk, you wouldn't be sitting here saying they

25 didn't -- they don't get to depose him about those phone

1  conversations?

2          MS. BOLGER:  I would -- your Honor, do you mind if

3  I stand?  My height --

4          THE COURT:  No, you may.

5          MS. BOLGER:  Sorry, Alex.

6          MR. SPIRO:  That's fine.

7          THE COURT:  Why don't you come here then,

8  otherwise it will be --

9          MS. BOLGER:  That's great.  Yes, I'm disadvantaged

10 by height.

11         THE COURT:  I'll accommodate that as well.

12         MS. BOLGER:  I do agree --

13         THE COURT:  You can come stand here.

14         MS. BOLGER:  Okay, that would be great.

15     I do agree, your Honor, that if there had been

16 conversations I feel like we'd be in a different situation.

17 And to be clear, all that Mr. Mac said in his declaration

18 was that he had no further conversation.  His declaration

19 doesn't talk about whether or not there was a preexisting

20 relationship or anything about BuzzFeed.  Candidly, your

21 Honor, I don't think Mr. Mac would know that.

22     But what Mr. Unsworth Counsel, Taylor, was just saying

23 is slightly beyond what was actually in the declaration.

24 What the declaration says is simply that they had no further

25 conversations.

14

1        THE COURT:  Right.  But why should he be required,

2 so they could -- what if -- what if at trial Mr. Musk,

3 notwithstanding his deposition testimony, says something

4 different?  Of course they could impeach him, but that

5 doesn't -- that's not the end of the matter.  So why

6 shouldn't -- if he's a percipient witness, why shouldn't

7 they get his limited testimony that says, "The only

8 communication I had with Mr. Musk are what are in these

9 emails?"

10        MS. BOLGER:  Your Honor, candidly, our biggest

11 concern about the subpoena for Mr. Unsworth is not the

12 question for Mr. Unsworth, it's the cross examination by Mr.

13 Musk.  And the reason for that, is that the things Mr. Musk

14 are asking for are simply completely irrelevant and also

15 absolutely privileged.

16        THE COURT:  Okay.  But I'm taking this in pieces,

17 because I do think that relevance will turn in part on Mr.

18 Unsworth's position.  So that's why I'm starting with Mr.

19 Unsworth.

20        MS. BOLGER:  So the way the shield law works is

21 that when you decide whether something is privileged or not

22 privileged, the Court should look to both the direct and the

23 cross examination, right?  It's not just that Mr. Unsworth's

24 examination would be at issue, it would be the whole scope

25 of the examination.  And the cross examination by Musk is of

1  concern if Mr. Musk is saying that he wants to ask all of

2  these questions about things that are totally irrelevant and

3  privileged.

4          THE COURT:  Okay, but my question is very narrow.

5          MS. BOLGER:  That one question --

6          THE COURT:  Why shouldn't he be -- yeah --

7          MS. BOLGER:  That one question, your Honor -- it

8  would be difficult to argue that that one question was

9  either irrelevant or unprivileged.  Our concerns are not

10  related to that one question, it's to the broad cross

11  examination that could follow.

12          THE COURT:  Okay.

13          MS. BOLGER:  And it could be done by a stipulation

14  that that one sentence in his declaration is acceptable at

15  trial.  Or one deposition by written question and so

16  stipulated.

17          THE COURT:  Okay.  And what else do you need then?

18          MR. WILSON:  Your Honor, we are truly just looking

19  for testimony of the fact of publication and the facts

20  testified to in his declaration in a way that would be

21  admissible at trial.  Nothing further.  Which is why, your

22  Honor, Plaintiff's Counsel has, as Ms. Bolger has suggested,

23  agreed that we would just stipulate that his declaration

24  would be admissible and Mr. Musk would do so, but understand

25  that he likely would like the opportunity to cross examine

16

1 the --

2      THE COURT:  Well that's what -- so what I'm

3 actually we're looking at, which I think -- paragraph six, I

4 understand, but it's paragraph five of his declarations,

5 which goes beyond.

6      MS. BOLGER:  Paragraph five of his deposition is a

7 quote from the article itself, your Honor, which is the

8 point.  Many of the questions that Mr. Musk's counsel just

9 told you they want to ask, they don't need to ask.

10     We produced an authenticated copy of BuzzFeed's

11 standards at the time the article was published.  We

12 produced an authenticated copy of BuzzFeed's current

13 standards.  We were happy to produce an affidavit that

14 authenticated the articles as published.  And the articles

15 that were published include the correspondence between Mr.

16 Musk and Mr. Mac and are not disputed.  Everybody agrees

17 that Mr. Musk sent those emails to Mr. Mac.

18     So some of the things that Mr. Musk was talking about,

19 the things that seem most relevant, we've already -- we've

20 already given and the parties already have.

21     THE COURT:  So I guess I don't -- I mean I

22 actually don't -- I don't get it.  I mean the reasonable

23 foreseeable is what Mr. Musk's understanding was, based on

24 the -- and you'll have your expert testify as to what's out

25 there, whatever communications he's had in the past with

17

1  BuzzFeed.  This isn't a 30(b)6 to BuzzFeed.

2       MR. SPIRO:  So yes, if I could just address a

3  couple of the questions that I think the Court is wrestling

4  with.

5     One is, remember, it could be an objective standard.

6  And if it's an objective standard, then to my mind the

7  policies and the procedures of the organization is exactly

8  what would be the first thing you would look to to decide

9  whether a person interacting with that organization is

10  acting in a way that they would expect the organization to

11  perform in a certain way or not.

12       THE COURT:  I know you say that "to your mind" and

13  that's what I got from your brief.  Was you kept saying it

14  and you cited nothing.

15       MR. SPIRO:  But --

16       THE COURT:  You cited nothing that supported that.

17     And again, I go back.  What if BuzzFeed was a complete

18  outlier and their policy, whatever it is, was the only one

19  in the world that was that way.  You see, it doesn't matter.

20  What matters is maybe what is the policy that is -- that are

21  out there.

22       MR. SPIRO:  I guess part of it is that there's a

23  long history of the interaction between the companies and

24  BuzzFeed.

25       But in addition to this --

1          THE COURT:  So if you want testimony with regard

2  to those interactions, that to me a completely different

3  matter.  That would, of course, be relevant because that

4  goes -- but that's not -- you didn't have a -- you didn't

5  give a notice to BuzzFeed about that.

6          MR. SPIRO:  Well, we noticed a deposition from Mr.

7  Mac.  We don't have an obligation to outline to Mr. Mac, at

8  least, every single topic and question that we would ask.

9          THE COURT:  But those interactions that you're

10 saying, the history that Mr. Musk had, were not with Mr.

11 Mac.  He wouldn't be qualified to testify to that.  What I

12 said is if you want a deposition of BuzzFeed, as to their

13 past interactions with Mr. Musk, I see that is relevant.

14 But Mr. Mac isn't qualified to testify to that, is he?

15         MR. SPIRO:  Well, no.  I believe that he is.

16         THE COURT:  How?

17         MR. SPIRO:  Because he's had interactions where

18 he's emailed with Mr. Musk and he's had interactions where

19 -- Again, I don't know until I take the testimony of Mr. Mac

20 what his position would be on.  Or, "Were you aware when you

21 emailed Mr. Musk of whether or not there was a standing

22 agreement between Mr. Musk and his companies and BuzzFeed in

23 which they consistently emailed things that are off the

24 record to BuzzFeed and they were not published?"  Mr. Mac

25 can either say, "no" or, "yes".  That's relevant.  Not only

1 is it relevant -- again, the Court is going to say, "I get

2 that it's relevant to you."  But to me it's critical.

3      But let me just -- to not get bogged down on this one

4 point.  I mean remedial measures are often times in cases --

5 there's a Federal Rule on it -- admissible to show whether

6 or not a person would have expected something at the time.

7 In this case, it's after they published this email, that was

8 written off the record, BuzzFeed changed their standards and

9 policies on their website.

10           THE COURT:  But is Mr. Mac -- what is his position

11 with BuzzFeed?

12           MR. SPIRO:  He's the senior --

13           MS. BOLGER:  He's a reporter, your Honor.

14           MR. SPIRO:  He's the senior tech reporter who's

15 interpreting those standards and interacting with people in

16 the marketplace.

17           THE COURT:  But why would he -- but see, I think

18 there's two separate things.  If -- you didn't notice the

19 30(b)6 to BuzzFeed, right?

20           MR. SPIRO:  We --

21           MS. BOLGER:  Your Honor, this is all a bit -- I

22 mean after our papers were filed, Mr. Unsworth filed his

23 opposition to the motion for summary judgment pending in the

24 underlying action and produced a correspondence with Mr. --

25 between Mr. Musk and one of his publicists.  I'm happy to

1  hand it to you.  But in the emails he says, "It was one of
2  the dumbest things I've ever done, to send an off the record
3  email to Ryan Mac."  He refers to himself as a -- excuse me
4  for cursing at you -- a "fucking idiot" for sending an off
5  the record email to Ryan Mac.

6       It's all pretend that there's something Mac is going to
7  say that's inconsistent with what Musk himself said in an
8  email, which I'm happy to give you, that's attached to the
9  opposition to the summary judgment motion.

10      Second of all, your Honor.  The policies and procedures
11 are on a website and all Mr. Musk needs to do is ask an
12 expert to look at them and opine on whether he thinks
13 they're consistent.

14          THE COURT:  You mean at the time -- at the time of
15 the emails, it's on the website?

16          MS. BOLGER:  It was on the website.  It was
17 changed.  And we have produced authenticated versions of the
18 procedures as they existed and the procedures as they exist
19 now.  You don't need Mr. Mac to tell you what those policies
20 and procedures were.

21      And as to this idea that there's some long history of
22 relationship between the company that would be probative, if
23 anything your Honor, if you read the article that is at
24 issue, the article at issue explains Mr. Mac's decision
25 making in deciding to publish the email.  It's right there

1 in the article that this is --

2         THE COURT:  But why isn't that hearsay?  You're

3 saying that the Plaintiff could offer that for the truth of

4 the matter, and he can't.

5         MS. BOLGER:  Well he certainly can, because those

6 emails have been authenticated.  They're all the things they

7 talked about.

8         THE COURT:  The emails.  You're saying the article

9 explains why Mr. Mac did what he did.  That's hearsay.

10         MS. BOLGER:  Well that's the point of the

11 stipulation about the declaration, your Honor.  In the

12 declaration, Mr. Mac authenticates the article and we would

13 be happy to have everybody stipulate --

14         THE COURT:  That's not -- it's not an

15 authentication question.  It's hearsay, right?  And the

16 problem with hearsay is that the other side doesn't have a

17 part -- an opportunity to cross examine.  So when you say to

18 me, "It's all in the article," that says to me, well then

19 maybe there is something to be done, because you can't rely

20 -- you can't -- Mr. Mac can't speak through the article.

21         MS. BOLGER:  Your Honor, but still the question is

22 what's reasonably foreseeable to Mr. Musk.  That's the

23 question.  What Mr. Mac does or doesn't think about off the

24 record, or frankly, whether the Yankees are really going to

25 be able to beat the Astros tonight, isn't relevant to what

1 Mr. Musk thought.  And in fact while I agree there weren't

2 many cases in Mr. Musk's summary judgment motion, we found

3 cases about reasonable foreseeability in publishing.  And

4 all of those cases focus on the mind set of the original

5 speaker, in this case Mr. Musk, not what happens downstream.

6 Those cases are cited in our brief.

7     THE COURT:  Let me ask you a different question.

8 This doesn't fall within the privilege?

9     MS. BOLGER:  Yes, it does.

10     THE COURT:  How?

11     MS. BOLGER:  Well the -- actually, can I ask a

12 question?  What's the "this"?

13     THE COURT:  Well, if they want to know what the

14 policy was at the time, that's certainly not a disclosure of

15 a source and it's not information that wasn't published.

16     MS. BOLGER:  Within -- within this circumstance in

17 this case related to this publisher, BuzzFeed had public

18 policies, which we have provided to them.  So I'm not saying

19 that those policies themselves are privileged.  I am saying

20 that asking Mr. Mac about Mr. Mac's interpretation of those

21 policies, or how they were applied here, particularly the

22 latter, how they were applied here, would be privileged.

23     THE COURT:  What case says that?  That that would

24 fall within the privilege?  Because that seems pretty --

25 that seems pretty broad.

23

1         MS. BOLGER:  Actually the Hurry case, your Honor.

2  Which is a Northern District of Illinois -- sorry, Northern

3  District of California case.  This court.  And the Hurry

4  case actually is very similar.

5         In that case, the plaintiff brought a FINRA

6  application, which had a tagalong defamation claim and the

7  plaintiffs in that case sought from the reporter information

8  about the general guidelines, related to things like

9  headline writing and fact checking and editorial guidelines,

10 and said, "Well this isn't within the privilege."  And Judge

11 Beeler issued an opinion saying, "Well one, this is within

12 the privilege.  And two, it's not relevant, but why don't

13 you go ahead and propound some written questions and then

14 you can object to them and I'll take a look at the

15 objections.

16        I have those written questions actually, your Honor.

17 These are them.  And the questions that were asked were, for

18 example,

19              "Did you employ fact checkers?

20         What were your general editorial

21         practices for verifying information?

22         Did you verify the information in this

23         article?  Were there any general

24         editorial practices concerning the need

25         for more than a singular source?"

24

1  Questions like that.  The publication objected.  I have the

2  objections in my hand, your Honor, if you're interested in

3  seeing them, and brought the matter back to Judge Beeler and

4  Judge Beeler quashed the subpoena on the grounds that those

5  kinds of questions were both privileged and irrelevant.

6      There are other cases that apply it.  In the <u>Fost</u> case,

7  your Honor, the question was about general editorial

8  guidelines and the court quashed the subpoena.

9      In <u>Delaney</u>, which is a California Supreme Court opinion

10 the questions posed to the reporter were, "What were in

11 their head when they saw an arrest on the street?"  The

12 court said that was protected by the reporter's privilege.

13         THE COURT:  Okay, all right.

14     Let me ask the Plaintiff.  So, I just want to be clear,

15 because Counsel kept referring to the article and what he

16 said, but the article as far as I can see is hearsay, but

17 all you're seeking is testimony that the only communications

18 that Mr. Mac had with Mr. Musk are those emails and no other

19 communications?

20         THE SPIRO:  That's correct.  And just for him to

21 confirm the fact of publication.  We won't be asking him if

22 the information in the articles is accurate, which is to Ms.

23 Bolger's point, what some of these courts have held falls

24 within the privilege.

25         THE COURT:  Okay.  All right.  But isn't the fact

25

1   of publication -- I mean you're not going to dispute that

2   those articles weren't published, are you?

3           MS. BOLGER:  They don't --

4           THE COURT:  On behalf of Mr. Musk?

5           MR. SPIRO:  No, but the other documents that we

6   need authenticated are not -- don't fit into evidence sort

7   of by magic.  And just because --

8           THE COURT:  So what documents are those?

9           MR. SPIRO:  The standards and practices and the

10  changing in the standards and practices.

11          THE COURT:  That were published?

12          MR. SPIRO:  Correct, which of course --

13          THE COURT:  And you'll stipulate that those are

14  authentic?

15          MS. BOLGER:  Yes.

16          MR. SPIRO:  Right.  But --

17          THE COURT:  Magic, boom, they're admissible.

18          MR. SPIRO:  Well there would have to be no

19  objection at trial.

20          THE COURT:  There's not going to be an objection

21  from the Plaintiff that those were the standards.

22          MR. WILSON:  Those have been authenticated and

23  your Honor, we're not here to talk about the merits of

24  reasonable foreseeability, which is -- the truth is that

25  there's no evidence that Mr. Musk had any idea that those

26

1  standards were -- even existed or published on line.  They

2  have --

3          THE COURT:  No, no, I understand.  That's a

4  different --

5          MR. WILSON:  Agreed.

6          THE COURT:  That's a different argument.

7          MR. SPIRO:  No, but Judge --

8          MS. BOLGER:  The standards have been

9  authenticated.

10         MR. SPIRO:  If I can respond to a couple of

11 things, just to take them in different orders, because I

12 can't jump up so easily.  It's exactly that issue, right?

13 That they're going to object to those standards and

14 policies.

15         THE COURT:  As being admissible?

16         MR. SPIRO:  Correct.

17         THE COURT:  Okay.

18         MR. SPIRO:  And --

19         MS. BOLGER:  Sorry, are they?

20         THE COURT:  But not because they're not

21 authenticate.

22         MR. SPIRO:  Correct.

23         THE COURT:  Not because they didn't publish them,

24 but because they believe they're irrelevant.

25         MR. SPIRO:  Right, but -- so let me try to come up

1  with a couple of examples, again.

2       The reason -- and I understand the Court's practicality

3  in taking this in slightly a different order than perhaps

4  the California Constitution and the compulsion normally is

5  handled, and I understand that, but part of the problem is,

6  a judge normally -- the deposition that we're seeking, we

7  don't think is more than hour.  We're not talking about a

8  seven-hour deposition.  The Court I don't think would find

9  any of the questions -- if they actually saw the questions

10 and the answers in the objections, there would end up being

11 practically -- and that's why there's not much case law on

12 it.  There would be a few objections, the parties would work

13 it out, and you'd never be at the point of having to, me

14 apply for a motion to compel, granting a motion to compel,

15 having him be held in -- me seeking his contempt -- that's

16 why it doesn't play out that way.  Because the questions I'm

17 asking are pretty simple, which are, "When you engaged with

18 Mr. Musk, did -- were you aware that Mr. Musk's companies

19 have constantly interacted with BuzzFeed off the record?"

20            THE COURT:  Why does that matter?

21            MR. SPIRO:  Because then it --

22            THE COURT:  Why does it matter if Mr. Mac was

23 aware?

24            MR. SPIRO:  Because whether it's foreseeable or

25 not that Mr. Mac would publish it, these are all objected

1 indicia of whether or not --

2       THE COURT:  Not Mr. -- your client didn't sue Mr.

3 Mac, didn't sue BuzzFeed.  He's a Defendant in this case.

4 Mr. Mac state of mind is not at issue.  It's not at issue.

5 What Mr. Musk's interactions were with BuzzFeed, I get it.

6 But whether Mr. Mac was aware or not is irrelevant.

7       MR. SPIRO:  Well Mr. Mac has given public

8 statements about what his mind set was at the time.

9       THE COURT:  And if Plaintiff was seeking to call

10 Mr. Mac and have him testify to that, I'm with you, I got

11 it.  But Plaintiff is not.

12       MR. SPIRO:  But why does it have to be -- Mr.

13 Musk, as a Defendant in this action, has rights to pursue

14 potentially relevant evidence.

15       THE COURT:  To claims or defenses, but if the

16 claim isn't making that argument, then it's not relevant to

17 a defense.

18       MR. SPIRO:  But with -- most respectfully, I don't

19 -- I don't see it that way.  If Mr. Mac were -- was to know

20 that Mr. Musk believes, and in his mind believes, that he

21 can send things off the record to BuzzFeed, then he's

22 altering what would be reasonable for Mr. Musk to assume.

23 Mr. Musk would be assuming --

24       THE COURT:  I do not follow you at all.  If you

25 had brought a breach of contract action against Mr. Mac, I'm

1   with you.  This is not.  He's not a party, he's not -- in
2   any way.  His state of mind, of which Mr. Musk was not
3   aware, is irrelevant.  What he -- what they communicated
4   back and forth is completely relevant.  And what we have is
5   an unusual -- maybe not today so unusual -- in which all --
6   we have every single one of those communications.  Every
7   single word exactly as it was communicated between the two
8   of them.  Right?  It's agreed.  Mr. Musk does not contend
9   that he had any other communications with Mr. Mac.
10       What --
11          MR. SPIRO:  Not with Mr. Mac, but with Mr. Mac's
12   publication, with his company.
13          THE COURT:  You didn't give a deposition notice to
14   Mr. Mac's publication.
15          MR. SPIRO:  Well we offered to turn, just so that
16   there was no question, this deposition into a 30(b)6
17   deposition.
18          THE COURT:  And maybe Mr. Mac isn't the right
19   person for that.
20          MR. SPIRO:  No, but we offered to BuzzFeed to
21   produce a 30(b)6 and that's briefed in the papers.
22          MS. BOLGER:  Your Honor, did you see the scope of
23   that 30(b)6 deposition?  That 30(b)6 deposition -- I'm
24   sorry, I need to just find -- this generous offer of a
25   30(b)6 deposition asks for -- I can't find my right paper --

1 asks for BuzzFeed's guidelines, BuzzFeed's prior publication

2 of off the record and on background information.

3           "BuzzFeed's prepublication review

4           process.  BuzzFeed's editorial

5           processes.  The scope and existence of

6           BuzzFeed's coverage of Elon Musk and

7           Tesla and Space X.  The scope and

8           existence of BuzzFeed's coverage of the

9           Thai cave rescue.  BuzzFeed's procedures

10           for predicting article popularity.

11           BuzzFeed's policies for determining

12           payment or bonuses.  BuzzFeed's

13           assessment of the likely popularity of

14           articles involved...." --

15         THE COURT:  Okay, I don't have a 30(b) --

16         MS. BOLGER:  It's all over the place.

17         THE COURT:  I don't have a 30(b)6 in front of me.

18     What is the schedule in this case?  Like has discovery

19 closed?

20         MR. SPIRO:  Discovery has closed.

21         THE COURT:  Okay.

22         MR. SPIRO:  Other than some of these additional

23 issues and there's a trial set for December 3rd.  But we've

24 agreed that --

25         THE COURT:  For December 3rd.

1          MR. WILSON:  I would just add for your Honor,

2 discovery didn't begin until June of this year and we're set

3 for a December 3rd trial.  So all of this is happened very

4 quickly.

5          THE COURT:  Okay.

6          MR. WILSON:  There was no delay on anybody's part

7 trying to get --

8          THE COURT:  Okay.  All right.

9          MS. BOLGER:  For the -- I've been talking.  There

10 were three subpoenas from Mr. Musk.  Two subpoenas that were

11 duces tecum to BuzzFeed and one just a -- to Mr. Mac and

12 there have been two subpoenas from Mr. Unsworth, one for

13 documents and then this one.

14          THE COURT:  Okay.  All right.  Well it sounds like

15 we need a deposition of -- a brief deposition, with respect

16 to that testimony.  And I could understand while at trial,

17 because he can't be made to come if he doesn't want to come,

18 that it would be video.

19          MS. BOLGER:  Can we do a deposition upon written

20 questions, your Honor?

21          THE COURT:  We can do it here, we can do it at the

22 courthouse, if you want to do it here, so I'm right here.

23          MS. BOLGER:  At which we're having one -- I have

24 to decide how to act next.  The question is, "Did you talk

25 to..." --

1          THE COURT:  I don't know.  I'm going to take it

2   under submission and I'm going to see.  I can tell you

3   sitting here right now, I'm just -- I'm not persuaded.

4       It seems to me -- now I'm just actually going to

5   comment on this case.  Which I think -- and you should think

6   about this if you're going to trial in December -- this is a

7   sad -- a sad case.  It's actually dismaying.  There were

8   these boys in Thailand that got rescued and what we have

9   here are two gentlemen that have blown the whole thing up

10  into an ego fight between the two of them and is taking that

11  away.  And you should think about how the jury is actually

12  going to perceive that and whether it's worth spending time

13  and money and the juror's time and money and effort on that.

14  Between, you know, what is an -- you don't need to comment.

15  I'm just telling you, I had a reaction to this -- reading

16  this -- and this fight, and with all of the stuff going on

17  in the world and stuff, that this is actually doing it.

18  People might want to think about whether that's worth it.

19  And I would encourage them to see if they can get it

20  resolved.  Because if you think about what's going in the

21  world, it's just -- it's not worth it.  It's not worth is,

22  right?  People said things -- everybody -- that no one ever

23  should have said.  There's no question about it, in a civil

24  society, which we tend not to have anymore.  But it's never

25  too late to start over and to stop and just stop and proceed

33

1 on what's important and what matters.

2     There I've said it.

3          MR. SPIRO:  Thank you, Judge.

4          THE COURT:  That's just my reaction to it both,

5 but you know, you are a client more than ever.

6          MR. SPIRO:  I agree with the Court's remarks and

7 we wish we weren't in this case in the first place.

8          THE COURT:  Well --

9          MS. BOLGER:  Your Honor, may I hand up to you the

10 email from Mr. Musk and also those -- the -- in which he

11 talks about how he's a fucking idiot to talk to Mr. Mac?

12          THE COURT:  That goes to the merits.  That doesn't

13 actually go to discovery --

14          MS. BOLGER:  Well it does go to reasonable

15 foreseeability, which is --

16          THE COURT:  No, that's what I mean.  It goes to

17 the merits.  If understand what the Plaintiff is going to

18 argue.  It doesn't go to relevance.  I can't say, "No, you

19 don't have to prove it because you're going to lose it."  I

20 actually think that that is actually a disputed issue.  I'm

21 not the trial -- but that's a disputed issue reasonable

22 foreseeability.  I don't know what the jury is going to

23 decide.  It said on background, but they didn't have an

24 agreement in advance.  Yeah, it turned out to be stupid, of

25 course.  Everything about this case turned out to be stupid.

34

1 What the Plaintiff said in the first place was -- Mr. Musk's

2 responses and then continued responses were also stupid,

3 right?

4         MS. BOLGER:  My last question, your Honor, is that

5 I do have those depositions of written questions that were

6 at issue in the Hurry case and I didn't know if it was

7 helpful for you to look at them, which Judge Beeler said --

8         THE COURT:  I can get them from the --

9         MS. BOLGER:  Okay.  I just didn't know if it would

10 be helpful for you, your Honor.

11         THE COURT:  I can get them from the case.  I'll

12 take it under submission.

13     In any event.  Yes?

14         MR. SPIRO:  So when we schedule that deposition, I

15 understand the Court is taking this under consideration.

16 What we would ask is at that time, if we pose questions to

17 the Court -- or we preface questions to the Court -- on a

18 very limited deposition that we would just ask that the

19 Court consider whether or not the shield law applies to

20 them, because we believe, for some of the reasons stated,

21 about the policies, about statements that he's made

22 publicly, that the jury -- that Mr. Musk has a right to ask

23 questions about these issues.

24         THE COURT:  But not if they're not going to come

25 into evidence.  See, that's what I don't get.  If the

1 Plaintiff was seeking to bring them into evidence, yes.  But

2 he's not, right?

3          MR. WILSON:  That's right.

4          THE COURT:  He's not seeking to bring them into

5 evidence, so I don't think you can make them relevant by

6 saying -- I mean they're not coming in.  They're not seeking

7 to come in.

8          MR. SPIRO:  Right, but that's not -- with all due

9 respect to the Court, what we're saying is -- what we're

10 asking the Court to at least consider is that Mr. Musk has

11 rights to put on a defense too.  And just because the

12 Plaintiff is not seeking to do it, or not seeking it -- this

13 is still a deposition in a case where we're seeking relevant

14 information.  The Court may hear some of the questions, or

15 hear proffered responses and say to themselves, "It's not

16 protected by the shield law."  And there's a chance, at

17 least to relevant information.

18          THE COURT:  All right.  But I may say in advance

19 that there is not chance, so you can't --

20          MR. SPIRO:  That is perfectly fine.  I hope to be

21 standing at that point.

22          MS. BOLGER:  And I remind that Rule 35 limits

23 relevance and the California Constitution guarantees a

24 privilege.  So relevance doesn't matter is it's privileged.

25          MR. WILSON:  Your Honor, I just want to add.  The

36

1  only two public statements I'm aware of Mr. Mac issuing,

2  were that he acted reasonably and ethically.

3           MS. BOLGER:  That's correct, your Honor.

4           MR. WILSON:  We're not asking -- we're not going

5  to solicit opinion testimony for Ryan Mac.  He's a fact

6  witness in our judgment and which I think is the difference,

7  your Honor, in seeing between what the parties are seeking.

8           MR. SPIRO:  But Judge, he's not allowed to make

9  public -- it's not protected by -- his credibility on that

10 issue of what ever he's testifying to, or whatever public

11 statements he's made, he can't -- he's part, as your Honor

12 said, of this case.  He's part of the fact pattern here.

13 And he can't be making public statements that effect a jury

14 pool about -- that I was reasonable, I --

15          THE COURT:  Oh, no, now you've really gone -- now

16 you've really gone astray.  And maybe now you're actually

17 getting to the heart of maybe what's going on here, that

18 this is being upset with Mr. Mac and what he said, as

19 opposed to actually relevant to this particular case, which

20 is -- which the Plaintiff has brought against Mr. Musk and

21 Mr. Musk has not sued BuzzFeed.  Because he can say whatever

22 he wants, that's why there's a First Amendment that says

23 that.

24          MR. SPIRO:  Of course -- of course, Judge.  But he

25 can't claim privilege over what he says.  That's all I'm

1  saying.  I'm not saying -- I'm just talking about the

2  privilege issue, right?

3      We're at a proceeding here.  This is not really, right

4  -- an evidentiary hearing.  It's a hearing about whether or

5  not they can in advance seek -- and that's why -- and the

6  last time I make -- that's why the process works this way,

7  which I think is where we've ended up.  Which is that, if

8  you pose questions and they are going to invade the

9  privilege, or have some other improper purpose, then you

10 can't ask them.

11         MS. BOLGER:  Respectfully, your Honor, I don't

12 think that's where we ended up.  What I think we ended up

13 with is that your Honor is going to tell us what -- there is

14 going to deposition, at least as to the Plaintiff's limited

15 question, which is very specific, which is whether Mr. Musk

16 and Mr. Mac had any other communications.  And then you will

17 make rulings about what other issues there are, which will

18 bear into account the questions of both privilege and

19 relevance, which we have raised.  I do not think we're in a

20 moment where we're going to get free flowing questions from

21 the -- from Mr. Musk's Counsel in response to --

22         THE COURT:  I haven't ruled, so --

23         MS. BOLGER:  Right.  I'm confused.

24         THE COURT:  So we're nowhere and I'll rule

25 whatever I rule.

38

1          MS. BOLGER:  Right.  Okay.  Great.  I was

2    confused.

3          THE COURT:  I've taken the matter under

4    submission, but I -- what I'm concerned about is that there

5    is -- that is going beyond what the litigation and that

6    there is other stuff going on with what my concerns -- what

7    I said before about the case.  And I'm trying to actually

8    cabin the case to actually be evidence relevant to this

9    particular case, because that's all that litigation should

10   be used for.  And so I'm going to take it under -- yes?

11         MR. WILSON:  I know you're trying to close the

12   hearing, and, I apologize.  I would be remiss if I didn't

13   respond just very briefly.  And I do respect your judgment

14   about the case.

15      Mr. Unsworth also wishes that one of the most powerful

16   men in the world hadn't called him a child rapist and he

17   married a 12-year-old child bride.  So I agree -- I

18   understand your Honor's position, but as far as whether it's

19   worth it, it's some of the worst things --

20         THE COURT:  No, I understand that.  I understand

21   that.  I guess -- but what I'm saying is whether someone

22   even talked to the press to begin with, when it had nothing

23   to do with them, and when they said something that they

24   didn't have to say.

25         MR. WILSON:  I understand.

1          THE COURT:  And all that I'm saying is not that it

2     wasn't defamatory, because it was probably I would think the

3     ruling was per se, right?  That's not the issue in that at

4     all.  I guess what I'm saying is, don't put it out there,

5     right?  What I'm saying is, think about how the jury might

6     respond to that at all, that it looks to be just like this

7     fight between these two gentlemen, when really all that

8     mattered was the rescue of those kids, period.  And no one

9     should have been out there trying to take credit for it.

10    All that should have mattered was that those boys got

11    rescued and returned to those families.  And isn't that

12    great?  And wouldn't that be great if that could just be the

13    end of it?  That's all I'm saying.

14          MR. WILSON:  Thank you.

15          MR. SPIRO:  Thank you, Judge.

16          MS. BOLGER:  Thank you, your Honor.

17          THE COURT:  All right, thank you.

18       (Proceedings adjourned at 9:43 a.m.)

19

20

21

22

23

24

25

40

<u>CERTIFICATE OF TRANSCRIBER</u>

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, November 12, 2019